## Adams v. Commonwealth.

(Decided Sept. 30, 1938.)

C. C. GRASSHAM, C. B. CROSSLAND, W. F. McMURRY, DAVID R. REED, W. A. MIDDLETON and ROY G. GARRISON for appellant.

WHEELER & SHELBOURNE, HUBERT MEREDITH, Attorney

General, and J. M. CAMPBELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

Appellant, charged by indictment with the murder of her husband, Ben Adams, upon trial was convicted of voluntary manslaughter, the jury fixing the penalty at imprisonment for sixteen years, and from a judgment following the verdict this appeal is prosecuted.

In appellant's behalf there are urged as grounds for reversal substantially the following:

(a) Much incompetent prejudicial evidence on part of appellee was allowed to be introduced, and in many instances the court failed to properly admonish the jury as to the purpose and effect thereof, if any was competent for any purpose.

(b) Both the commonwealth's attorney and employed counsel indulged in misconduct by making inflammatory arguments to the jury, and in going beyond proven facts in arguing the case.

(c) Misconduct on the part of some of the jurors who had on voir dire examination denied the formation or expression of opinion as to guilt or innocence of accused, it being charged that they had heard sufficient facts to form, and had theretofore formed opinions.

(d) The court erred in not granting appellant's motion for a directed verdict of acquittal at the close of the commonwealth's evidence, and upon the close of all the evidence. It is also. urged that the verdict of the jury was flagrantly contrary to the evidence.

A presentation of the facts, since the plea of appellant was solely one of self-defense, may be best made by giving her version of the tragedy.

The homicide occurred in the law office of deceased, in an office building in Paducah, early in the morning of July 15, 1936, and at a time when only accused and deceased were present. Appellant was a native of Virginia, and was married to deceased at the home of her parents when she was about fourteen or fifteen years of age, and deceased was about twenty-seven. After the marriage they went to Bardwell, the home of deceased,

to reside. He was then or afterwards became county attorney of Carlisle County, later elected Commonwealth's Attorney of his judicial district, and at the time of his death was actively engaged in the practice of law in McCracken County.

During their life in Bardwell their relations were affectionate, continuing so until their removal to Paducah some time in 1926 or 1927. The cordiality seems to have ceased soon thereafter; the conclusion being inescapable, according to testimony, that this strained situation arose from the entry of another woman into the life and affections of the husband. Appellant first became aware of this when the husband was called to the home of the alleged interloper about midnight at one time.

It is also developed that deceased had obtained a divorce judgment for Mrs. Walker, and had represented her in other litigation; that upon the death of her child deceased had sent $10 worth of flowers, over appellant's protest. Later, Mrs. Walker and accused had a stormy meeting. Afterwards Mrs. Walker (who later had her name of Mrs. Nanney restored) was employed by deceased. She remained most of the time in his private office. Appellant complained that she had watched and seen the two in embrace. She also noted circumstances which led her to believe that the relations between the two had progressed further than mere embrace. Appellant accused deceased, and she says he admitted the charge, and promised to desist. Appellant says that this promise was not kept; that later she came upon them in the office under such circumstances as satisfied her that the relationship still existed. She begged the woman to refrain from attempting to break up her home. Later the two met in the office of another attorney and engaged in a personal encounter. On these various occasions appellant makes it appear that deceased sided with the third party, and had struck appellant on more than one occasion. This happened not only at the home but at other places, including the office of deceased. This situation continued for some time. At one time, not essential to mention, Mrs. Adams went back to Virginia. She later returned to Paducah and says she was convinced by certain evidence that the relations between her husband and the third party were continuing. In the meantime, during her stay in Virginia,

deceased had begun, and notified her of, divorce proceedings. She wrote him that she desired to continue to live with him. The divorce suit was filed in March; she returned to Paducah about the first week in April. She went to his office and expressed and emphasized her desire to continue their marital relations, and told him that the third party was the cause of their domestic troubles.

She relates that she and the husband, after April 3, frequently ate their meals together, she continually begging him to give up the third party. He had asked accused not to do anything about the divorce suit; that he would "see her." The matter moved along under similar circumstances and conditions until the serving of notice of taking depositions in the divorce proceedings. The following morning the two breakfasted together at a coffee shop. There they discussed the situation. She assured him that she was going to fight the divorce. She had in her possession some personal effects and documents, which she conceived would be strong evidence against deceased in the prosecution of his divorce case. She says he insisted on her going to his office and turning over this evidence to him. This she refused to do; later upon his insistence, she went with him. When they arrived deceased proposed that she surrender to him the evidence which she had in her possession, and sign an agreement not to contest the divorce action upon consideration that he give her $150 per month during her life. She vehemently rejected the proposal, and deceased then became very much enraged. He jumped up from his desk; walked to his safe and opened it, came back to the desk and said: "You are going to write that damn agreement, and write it right now." She replied: "Mr. Adams, I am never going to agree for another woman to take you from me, and there is no use arguing."

Accused said that her husband then jumped up and grabbed her by the arm, jerked her out of her chair and angrily demanded that she sign the agreement; she refused and he said: "If you don't sign it * * *," and then began to beat her about the face and head, saying, "I will kill you, G. D. you." "I will shoot you, G. D. you." She then continues: "When he said that, I saw the gun in the drawer, and I saw his face and knew he meant it; I begged him not to kill me." She says she

grabbed him by the shirt, and tried to pull him back from the desk drawer in which she saw the pistol "fitted down in it." "I tried to pull him away from it, and we scuffled at the end of the desk. I could not hold him, and saw that he was going to get it if I did not; we were both grabbing for it. He was still beating me." She secured the pistol and fired one shot, and deceased staggered back, but again started at her and she shot again. She says: "His hands fell down, and I knew he was not going to fight me any more, and I grabbed him around the waist." Deceased went toward the door leading out of the office, and she eased him down to the floor, bathed his face and talked to him; "tried to do something for him, but there was nothing I could do. I asked somebody to call the doctor and some one did."

On cross-examination she said she shot "because I knew he would kill me. I knew he would. He had his eyes drawn down; they were mere slits. He had a mean look, and was reaching for his gun." Mr. Wyatt testified that about one month before Mr. Adams was killed he saw a pistol in the drawer of Mr. Adams' office desk. It was a revolver, and looked to be a .32 calibre. He doubted whether he would be able to recognize the pistol at the time of the trial. Dr. Gore testified that prior to the time of the tragedy he had seen a pistol in the drawer.

Robert Eley was asked by Mrs. Adams to intercede with her husband, looking to a reconciliation. He was unsuccessful, though the extent of his effort is not shown. He did say that Adams told him, substantially, that he could not live with her because she had misconducted herself and mistreated him. The circuit judge testified that Mrs. Adams asked him to intercede. He declined because of friendship for both parties.

Joe Bondurant testifies that he saw Mr. and Mrs. Adams about seven o'clock on the morning of July 15, and heard a conversation between them. Mrs. Adams seemed to be much excited. He heard her say she would go home, or to the hotel, and Adams, taking her by the arm, replied, "No, you are going over to the office and settle this thing right now."

Effie Riggs testified that she was laundress and washed deceased's linen. He brought some laundry, and shortly thereafter Mrs. Adams came and got the

bundle. This occurred after she came back from Virginia. Mrs. Adams claims that it was from this bundle she procured some soiled linen, which she preserved for evidence against her husband.

John Kirksey testified that he had notified Mrs. Adams of the pendency of the divorce proceeding, and that she had sought his efforts in intercession. He talked to Adams who said: "John, I am willing to support her, but I cannot live with her. She is dangerous, goes to sleep with a hammer under her pillow. I have never had any home life." This was incompetent.

Florence Gibbs, a stenographer in a law office in the same building as Adams, testified that she was well acquainted with both parties. She heard the two pistol shots, which she thought were fired in rapid succession. She was just taking the elevator for the fifth floor when she heard the shots. She went to Adams' office and saw his body, his feet close to the door, the body in the hallway. Mrs. Adams was standing over the body of her husband, rubbing his hands. She was hysterical and crying, "I tried to get him not to do it. Sin was the cause of it; if I could have kept him from doing it." This witness tried to quiet and console her. Mrs. Adams said: "I grabbed him and tried to keep him from doing it. He jerked away from me." This witness described in some detail the private office; the furniture therein, and the general situation, and location of same with respect to the door leading from the private office into the hallway. She also found a tie clasp on the floor, which she identified as one he usually wore. There were also two or three opened letters in there lying on the floor. These were between the desk chair, and a chair about two feet away nearer the wash basin.

As bearing on Mrs. Adams' testimony, that she looked through the mail slit in the door leading to the reception room and saw Adams and the third party, this witness testified that one could peep through the slit and see the desk, chair and wash basin, in the private office, if the door between the reception room and private office was open. She also said that the only way other occupants of another room could see into Adams' private office was to sit or stand at a certain window.

Rev. George Heaton testified that for a long period he was in charge as pastor of the Baptist Church in

Paducah. After Mrs. Adams returned from Virginia in April, 1926, she asked him to use his efforts toward reconciliation. Some time in April, he found Mrs. Adams in a car (her car) late at night. He took her to the Oxford Hotel and registered her as a guest. This witness said that he talked to Mr. Adams, and found that any attempt at reconciliation would be futile. He never told Mrs. Adams exactly what Mr. Adams had said, and that he "tried to work it out along another line."

Frank Leasor examined the drawer from which Mrs. Adams said her husband had taken the pistol. He made a test to ascertain whether or not a pistol would go into the compartment which had letters in it. He used a thirty-eight. The pistol in evidence was a thirty-two. He said the pistol would go in the drawer "like this" indicating.

Mr. W. A. Blackburn, and many others friendly to both, were asked to, and did, intercede on behalf of appellant.

Mrs. Adams (no relation) was jailer at the time appellant was committed. She says appellant had a knot on her head, and the next morning her eye was swollen. She identified the pocket book of Mrs. Adams which she brought to the jail. This testimony tending to show evidence of an assault, or struggle was borne out by other testimony.

Jesse McInteer, insurance agent, occupying the same office building, said his attention was attracted by a conversation out of ordinary tones. He paid little attention until he heard a woman say: "Don't shoot me; don't kill me." This was repeated more than once, and almost immediately two shots were fired. After the shots he heard the same voice cry: "Oh, I have killed you; why did you make me do it." Witness called police headquarters and told them there had been a shooting on the fourth floor. It developed that the shooting was on the next floor above, the witness went up there. He saw two women; one said: "Call a doctor." The witness asked who she should call, and Mrs. Adams said, "Dr. Dowdall," and he went to the phone and called the doctor. He went back after the call and saw several other persons in the room and hall, including police officers. He heard Mrs. Adams repeat, "Why

did you make me do this? Sin was the cause of it," and mumble other unintelligible words. This witness testified that the voice he heard in the office was a woman's voice, "it was Mrs. Adams'." On cross-examination he admitted that Mr. Adams at times talked in a high pitch, but insisted it was the voice of Mrs. Adams.

Charles Brown, engaged in general maintenance of the office building, on the morning of the homicide was on the second floor near the elevator shaft. He heard someone on the third floor scream, and used words which sounded like, "Don't do that." He was only sure of the word "don't." It appeared to be a woman's voice.

We now take the commonwealth's direct evidence, taking up later the further cross-examination of some of defendant's witnesses, and rebuttal testimony. The funeral director, who embalmed the body of deceased, showed on diagram where Adams' body was lying when he arrived, just outside the office in the hallway, almost in front of the door. He introduced as evidence parts of the clothing, including his powder-burned shirt. The body showed two wounds; one about the fourth or fifth rib on the right side; the other through the upper part of the abdomen. The one under the right arm went through the body. The other almost, but not entirely, through the body in a straight line. This witness said that Adams' shirt was pulled out of his trousers about four or five inches. The coroner who held the inquest, bore out the testimony of the embalmer. There was evidence by the commonwealth, tending to show that there was no pistol in the drawer, and that Mrs. Adams carried the pistol in her hand bag on this occasion. There was also evidence of previous threats, and this evidence will be taken up later. It is proper to say that appellant was contradicted in many matters, material, or immaterial, and there was testimony attacking her reputation.

A review of the record convinces us that the judgment below should be reversed for reasons later set out, hence it is unnecessary to discuss grounds (c) and (d) since on another trial the matters embraced therein may not appear. These questions, as well as others not specifically decided are reserved.

The commonwealth's attorney testified to the effect

that he went to the office of deceased shortly after the homicide to make an investigation. The purpose was to contradict the evidence of Mrs. Adams, who had said the desk drawer was open, and she and deceased were engaged in a struggle, each attempting to get (and she got) the pistol first, which she says was in an open drawer "in front part, sticking down; right down in here." She nowhere said the pistol was lying on top of the letters, which were in the drawer. This witness was asked, "Could this pistol be put in the drawer and closed?" and answered, "I looked at the drawer particularly with the purpose in view, and it would have been utterly impossible to have put a pistol in there and to have closed the drawer, with the pistol on top of the letters; they were jammed up tight together." Mrs. Adams had testified as above stated, and other witnesses testified that the pistol could have been in the drawer in the manner described by her, and in which position a pistol had been theretofore seen, on one or more occasions by seemingly disinterested witnesses.

On cross-examination the witness admitted that: "It would be possible to put a *small* gun in there if you had shoved them together. There might have been space to have dropped it down in that way, but it was impossible to put your hand down in there and get the gun out." Another witness testified that a .38 calibre could be put in the drawer when he examined it. The .32 was there at the time witness was investigating, but it seems that no test was made with this weapon.

It is not our duty, in respect of this evidence, to determine its weight. We are to determine whether or not it was incompetent, and if so was it to the substantial prejudice of appellant. That it was so there can be little doubt, since it is subject to the criticism that it was not shown that the drawer was in the same condition when witness examined it as it was immediately after the homicide. In fact, this witness testifies that when he made his examination the drawer had been closed, and he opened it, and "the police had seen about this drawer." And numerous persons had theretofore been in the private office. Other witnesses, including Mrs. Adams, had testified that the drawer was open. We think it was to the prejudice of appellant, since from it the jury might draw unauthorized inferences; and coming as it did from an officer of the law,

a public prosecutor, it no doubt carried more than ordinary weight with the jury.

Mrs. P. C. Adams, mother of deceased, testified that in the early part of May, and after the divorce suit was filed, appellant had said in her presence that she never would give Ben a divorce; that she was not going to do anything until he began to take his depositions, and then was going to do her work, and he would suffer; that as long as she did not take his proof she would not do anything.

In view of appellant's testimony, and others, we can not say that the language used would constitute a threat to kill Mr. Adams. Appellant was contending all the time that she had in her possession, and was going to use in the divorce suit, evidence which she thought would defeat the divorce action. Some of this is in the record. This witness, as had many others, had been asked to go to Mr. Adams and try to get him to agree to continue to live with her, vehemently contending up to the last that she wanted her husband to live with her.

The prosecution attempted to fortify the testimony of this witness by the introduction of a letter written by appellant to a brother-in-law of the witness—the same uncle Ben who had caused the meeting of deceased and appellant, which finally culminated in the marriage of the two. Uncle Ben (still living, and 94 years of age) did not testify, but it is not denied that he had received the letter some time in 1934. We here copy the letter in full, which was introduced over protest of appellant, and read into the record:

"Dear Uncle Ben: What you said to me Sunday in the car has worried me lots (about not knowing me) but can not imagine what young woman you thought he was driving around with. If I catch any woman in 'that car' I intend to kill her, 'unless I miss my aim.' He is mine, I love him, even to worship!

"It kills my soul to see him work so hard, we doing without proper food, and spending it on those farms so his family can live on the 'fat of the land.' It seems strange to me that they cannot realize he is a married man; therefore, 'I should come first.' But they try to push me in the background and all hound him for money.

"I am getting fed up on it and when I break loose they will—each and all think I am the whole World's War. Still water runs deep you know, and I am nobody's fool. Mr. Adams is in debt—way behind with our room and office rent, so there is a limit to what he can do for his family, and the fellow who causes trouble between us, 'I'll pick dry,' and don't mean maybe.

"Wanted to tell you these things but you do not hear so well, so write them so you can put them on their right track for I am all 'fed up' on this. Your mind is so clear and understanding that I know you will get my meaning when written. Best love and good wishes, Always, Your Little Glad.

"You can tell Mr. Adams of this letter if you wish. I am no coward, therefore, do not shoot from ambush. Am in free America, Uncles volunteered in the United States War, Brother volunteered in the World War, so no coward blood nor deception flows in the veins of one bred and born in 'good ole Virginey where cotton, corn and sweet taters grow.' Thank God, Just Little Glad, Ben Adams' Jr.'s Wife."

(Note) At the bottom of this letter is written in pencil the following:

"You introduced us, we are your children since you had none of your own, but sacrificed your life for 'Phil and his.' But where? are you now? Right where I would be were I to 'ride the rods as you did,' but Nay—Nay—Pauline.

"Time has taught me more sense. Whether it be a woman or family who cause us a separating, I will do my utmost for he is mine.

"Before I write you again I hope to have a pen point that will carry 'ink that is ink.'

"I am awfully sick and nervous, but still have my good horse sense and not so dumb as some think I am."

The introduction of this letter should not have been allowed. Admittedly written long before there was any mention in the record of any divorce suit or evidence of proposed action looking to that end, it was perhaps

under some decisions of our court, too remote. Turk v. Com., 239 Ky. 55, 38 S. W. (2d) 939. Aside from this, however, it contains no threat against deceased. Nothing therein indicates that there was lurking in appellant's mind an intention of doing harm to her husband, whom she was trying to save for herself. It may be that (in connection with other testimony) the letter would have been competent had the homicide resulted in the death of the third party, or perhaps some member of deceased's family. It might then have been, (if not remote) competent to show a state of mind, or intent to do personal injury to such one or ones as might have been reasonably included within its terms. As we read it, it does not tend to show a state of feeling against deceased, or a state of mind which might have led to the taking of his life. We conclude that it was prejudicial to allow this letter to be read to the jury, and that the testimony above mentioned should have been excluded.

Complaint is made of the testimony of Coleman and Foster. Coleman said that shortly before Mr. Adams' death, Mrs. Adams was sitting on a divan at the boarding house, and dropped her purse. When appellant dropped it, "it sounded like something was in it, and she stooped and picked it up, right quick." "She saw others noticing it and turned it over right quick."

Foster said that shortly before deceased was killed, appellant was at the table with the pocket book on the edge of her lap, "she dropped it and it made an awfully heavy noise. She looked down and saw it; picked it up and turned it over." Neither of these say that she had a pistol in her purse, though one saw a "print" of *something* The testimony, while not to be classed as substantially prejudicial, was irrelevant. Neither ventured to say that the purse contained a pistol.

Two witnesses, Dr. Heaton of the Paducah First Baptist Church, and Mr. Blackburn, an attorney, and formerly U. S. District Court Clerk, were asked (as were many others) by appellant to intercede, and use their efforts to bring about reconciliation. Dr. Heaton said that he approached Mr. Adams. From the testimony it is apparent that his effort was actuated by a really Christian spirit. When he related that he made the approach, and was asked as to results, he replied: "I will give my general impression. I would rather not

repeat just what he said. My general impression was that it was futile to attempt to effect a reconciliation.'' After much colloquy, following the court's ruling that Rev. Heaton need not tell what Mr. Adams said to him, he was asked: ''I will ask you to state why *you* thought it was futile?'' Over objection, he answered: ''Because of his complaint about Mrs. Adams.'' This was error. The commonwealth, knowing that under decisions of this court it was not competent to introduce evidence of conversations with deceased, except in certain cases, forced such an answer, as to leave the jury under the impression of misconduct on the part of appellant. Since he could not state competently what Mr. Adams' reasons for rejection were, it was incompetent to give his conclusions. Com. v. Begley, 272 Ky. 289, 114 S. W. (2d) 127. The testimony of witness, Blackburn, is likewise subject to criticism. In addition to testimony in respect of the attempted reconciliation he was asked, ''Was anything said about a pistol,'' and over objection witness said, ''Mr. Adams told me a circumstance regarding a pistol,'' this was after witness stated that deceased had said: ''Well, you go back to Mrs. Adams and tell her that I have stood that as long as I can stand it, and I am not going to withdraw the suit.'' He said: ''Mrs. Adams had promised so many times to quit drinking, but she had broken her promise so many times, he was not going to withdraw his suit.'' This testimony was incompetent. Shell v. Com., 245 Ky. 535, 53 S. W. (2d) 954; Johnson v. Com., 250 Ky. 297, 62 S. W. (2d) 1025; Turk v. Com., 239 Ky. 55, 38 S. W. (2d) 937.

Appellant was questioned at great length as to alleged conduct with a member of her church, a young man who sang in the choir. She was asked if he had not been seen riding around with her; had not written her and called to see her at the jail. She admitted these impeachments, but denied any untoward conduct. She was asked if it was not a fact that along about the time stated, ''you and your husband did not have an argument, and he wrote a letter to your brother telling him about the incident I have described, and saying he could not live with you under these circumstances?'' She answered in the negative. The evidence sought to be elicited by this line of interrogation if admitted, and manifesting meretricious conduct on her part, of isolated

acts of immorality, were inadmissible as being irrelevant, and not tending to indicate that she had any intention of doing away with her husband. All evidence relating to such matters should have been rejected. Frasure v. Com., 245 Ky. 127, 53 S. W. (2d) 204.

We come now to the complaint of the alleged misconduct of attorneys for the commonwealth in argument. Special counsel in argument to the jury at one point said:

"You have to believe Mrs. Nanney (Alta Nanney) is a courtesan and perverse woman, if you turn Mrs. Adams loose; you say her character is bad—her character is at stake. You turn this woman loose, and you thereby ruin her (Mrs. Nanney's) character."

Turning to appellant:

"You put Ben Adams where you can no longer dog him; you have done it all his life; the best thing you ever did for him was when you killed him."

"You can read in the papers every day of women shooting men, there is an open season on them. If you turn her loose, we will have a court house full of cots, as she is now on. * * *

"Ben Adams was trying to get rid of a drunken woman. He so told Judge Blackburn he was tired of a drunken woman; he was tired of having her disgrace him."

Much of the language used by the attorney was uncalled for. We have shown that what deceased had told Mr. Blackburn, as to getting rid of appellant was incompetent. No reference should have been made to this evidence. There was little competent evidence that appellant had "dogged" her husband, and none that if so, it had been for all his life. Quite the contrary appears. The reference to what the jury might have read in the newspapers was entirely out of place. These statements, or some of them, were made without evidence to back them up, as we view it, had the purpose of inflaming the minds of the jury, and no doubt did so to some extent.

The commonwealth's attorney made the closing argument without any opportunity for defense to reply or

explain. In the course of his argument, the following occurred:

> " 'I want to show you something' and he unscrewed and took the handles from off the pistol, and on the inside of the handle were the initials 'H. M. S.' And then the commonwealth attorney said: 'She says her brother's name is Hilton Stembridge— look at that (showing the pistol) and see whether she had her brother's pistol or not.' He passed the handle of the pistol around to the jury."

There could be less criticism of the statement and action of the attorney had the practice been less sharp, but the fact is that there is nothing in the record to show that this disclosed evidence was before the jury. It is true the pistol had been introduced, but no particular part of it had been pointed out to the jury; certainly their attention had not been called to the part bearing the initials "H. M. S." on the inside of the guard.

The statements and actions, coupled with the practice by which counsel no doubt hoped to make them proper, made the statement and display of the guard improper, and, as we view it, highly prejudicial.

In cross-examining Mrs. Adams, counsel for the prosecution went to great pains and took some time in getting the life history of appellant. He particularly brought out the full names of her sisters and brothers, among the latter of whom was one named, "Hilton *Dallas* Stembridge." In arguing to the jury he only mentioned a part of his given name. He did not mention the "Dallas" or the initial "D."

It is noticed that there is no proof that any one of the brothers owned, or had furnished appellant with a pistol. The commonwealth's attorney went out of the bounds of propriety in doing and saying what was said and done. Nor is it any answer to say in brief that defense counsel had knowledge of the presence of the carved initials. The methods used by the attorney in an attempt to get the evidence before the jury, no doubt, led defense counsel to believe that no reference would be made to the initials. To say the least, they were not put on guard, and the language and actions described were prejudicial and should not have been permitted.

For the errors indicated above, we are of the opin-

ion that appellant was not accorded a fair and impartial trial, hence the judgment should be and is reversed with directions to grant a new trial.