**Evy Lee GOODMAN, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Dec. 16, 1955.

her husband. A trial resulted in a conviction of voluntary manslaughter and her punishment was fixed at two years in the penitentiary. On this appeal she insists the court erred in: (1) not sustaining her motion for a directed verdict of acquittal at the conclusion of the Commonwealth's evidence and again at the conclusion of all the evidence; (2) admitting incompetent and prejudicial evidence over her objection. She further complains the Commonwealth failed to prove the corpus delicti and that the verdict is flagrantly against the evidence. In reality these last two grounds for reversal are included in ground one.

At the time of the tragedy on May 14, 1954, appellant and her husband were each 38 years of age, and had been married nineteen years. They had two children, a daughter, Faye, and a son, Eugene, who were respectively 19 and 16 years old at the time they testified for the Commonwealth.

The Goodmans did not have a happy married life. Appellant left her husband in January previous to his death and sued for divorce. Soon thereafter her son became ill and she dismissed the divorce action and returned to her husband's home. Ebb drank to excess and he and his wife many times quarreled violently. When angry Ebb often threatened to kill his wife; also, on several occasions in a vague and indefinite way he threatened to take his own life. There is testimony that appellant, in the presence of her neighbors Mr. and Mrs. Marshall Bertram, threatened to kill Ebb, but her threats were made in a light vein, so Mr. Bertram testified.

The couple lived in a 5-room house, four rooms downstairs and one room upstairs, in a rural community in Wayne County. Appellant testified her husband had contracted a venereal disease and she had not shared his bed for some six years. She slept with her son in a downstairs room which was 12 feet by 12 feet and her husband slept in an adjoining room which was 12 feet by 16 feet. The two rooms were connected by a door and the beds of the couple were against opposite walls. On

R. B. Bertram, Monticello, Hile Pritchard, Albany, Leonard E. Wilson, Jamestown, for appellant.

J. D. Buckman, Jr., Atty. Gen., Hugh L. Hollingsworth, Asst. Atty. Gen., for appellee.

SIMS, Judge.

Appellant, Evy Lee Goodman, was indicted for the murder of Ebb Goodman,

the wall above Ebb's bed he kept two guns, a rifle and a shotgun. On the night of the tragedy their daughter was in the home of a neighbor woman, about a half-mile distant, where she had been staying at nights for several years as a protection to this woman.

The proof shows no quarrel between appellant and her husband on May 13. Late in the afternoon of that day Ebb drove his daughter to the home of this neighbor woman where she spent the night. The son a little later took his father's car and went to a card game called "Rook". Appellant testified Ebb became angry because the boy went to the game without him and that Ebb "growled all evening about it." She went to bed about 8 o'clock while Ebb was upstairs getting a book. Mrs. Bertram testified that about three weeks before Ebb was killed appellant said to her, "He had the awfullest fit on him you ever saw. * * * The next time he comes in that way, I will kill him. Just wait and see if I don't."

The son testified that he came home around 9 o'clock, went to his father's room, took off his shoes and then went in his mother's room and got in bed with her. She asked the boy if he wanted anything to eat, he replied in the negative and then both went to sleep. The son did not turn on the light in the room of either parent, but noticed his father in bed and heard him "grit his teeth." The boy did not remember whether he closed the door between his parents' rooms. Both the son and the mother testified they did not leave the bed during the night and neither was awakened by any noise or shooting.

Around 6 o'clock the next morning the daughter came home and as she stepped up on the porch she heard her father "sorta struggle" (which other witnesses described as a gargle), and found him in bed "covered with blood." She screamed and ran into her mother's room but did not know whether her mother and brother were then asleep. Her mother and brother came into the father's room and neighbors and a doctor were then summoned.

Ebb was lying on his back in bed with the bed clothes covering him to his waist. He had been shot one time in the forehead between his eyes with a .22 rifle, which was lying on the floor near a pool of blood "with the muzzle angling toward the bed." Ebb's face was covered with blood and there was a pool of blood on the floor "between the dresser and the bed, about one foot from the bed." There were no powder burns on Ebb's head. He was unconscious when his daughter found him and he never regained consciousness and died about 4 o'clock that afternoon in a hospital.

A flashlight with the glass broken out was found under appellant's pillow and on its reflector there were two or three specks of blood. Appellant explained she always kept this flashlight under her pillow so if she got up during the night she would not disturb anybody by turning on an electric light.

An expert from the Federal Bureau of Investigation testified this was human blood on the flashlight, but there was so little it could not be determined whether it was of the same group as the father's blood on the floor. A detective of state police arrived shortly after Ebb was found shot. No fingerprints were taken from the rifle for the reason it had been picked up before he arrived. This detective further testified there would probably be no powder burns on Ebb's face if the rifle were fired with its muzzle against the victim's forehead.

Dr. Mack Roberts testified that in his opinion the wound had been inflicted "four, or five or six hours" before he saw the victim.

There was proof that Woodrow Daniel, a fishing and drinking companion of Ebb, often visited the latter's home and at times while Ebb was absent. Mrs. Marshall Bertram, who lived around 100 yards from the Goodman house and whose husband was a relative of Woodrow, testified that when Ebb would come home and Woodrow would be there, Woodrow would soon appear at her home and be out of breath. She further testified that about 8 o'clock on May

13th she heard Woodrow's car stop at the Goodman home, then another car came up "just in a minute * * *. I knowed it was Ebb, and so this first car took off * * *. So, another car went on behind him, and Ebb wasn't gone but a few minutes. * * * I heard a sound, it sounded like a woman squealed out and a man say something. I jumped in the bed as quick as I could and covered my head up."

On cross-examination appellant did not object to questions asked her concerning Woodrow living in her home since her husband's death and she replied that he had lived in her home as a boarder since January 1955.

 It is insisted by appellant it was not competent for the Commonwealth to prove she had made threats against the life of her husband until after the corpus delicti was established, citing Evans v. Com., 221 Ky. 648, 299 S.W. 553. The Evans opinion holds that threats are not substantive evidence but are admissible to show malice. The corpus delicti may be proved by circumstantial evidence. Blankenship v. Com., 228 Ky. 830, 16 S.W.2d 478; 2 Burdick, Law of Crime, § 424, p. 106. These threats, some of them made shortly before the tragedy, are strong circumstances against appellant and were competent evidence. It was for the jury to determine whether they were made in jest or in earnest. As was said in Powell v. Com., 308 Ky. 467, 214 S.W.2d 1002, when circumstantial evidence is relied upon to establish the corpus delicti, it must be more consistent with the guilt than with the innocence of accused.

 Here, it was shown the husband died as the result of a rifle bullet entering his forehead; that appellant was in the adjoining room at the time, yet neither she nor her son heard the fatal shot; that she had a flashlight under her pillow with human blood specks on the reflector; and she had a motive for killing her husband so that she could get rid of him and prevent his interference with her and Woodrow Daniel. None of these facts when considered separately are enough to establish appellant's guilt; but when they are woven into one chain they are more consistent with her guilt than with her innocence. Under this proof it was for the jury to determine whether appellant killed her husband or whether he died by his own hand. It is strange that neither appellant nor her son sleeping with her heard the report of a shot in the adjoining room. This most unusual fact might have had great weight with the jury in deciding that appellant rather than her husband fired the fatal shot into his forehead.

We refer the reader to Cassell v. Com., 248 Ky. 579, 59 S.W.2d 544, where the jury convicted the accused solely on circumstantial evidence of killing his wife and the verdict was upheld by this court. Although that was a case where poison was administered, yet we had the same issue there as we do here—whether death was caused by the act of the accused or whether the victim was a suicide. There, much is written on when circumstantial evidence is sufficient to sustain a conviction and many authorities, pro and con, are cited and we do not deem it necessary to go into them in great detail. Suffice it to say, the evidence here is equally as strong as it was in the Cassell case. However, there is this difference, the penalty inflicted there was life imprisonment while here appellant was convicted only of manslaughter and given the minimum sentence of two years. The jury in the instant case might have reached the conclusion appellant and her husband quarreled violently and she killed him in sudden heat of passion, which reduces murder to manslaughter.

 Appellant argues that isolated instances of her meretricious conduct were inadmissible for the purpose of showing motive, citing Frasure v. Com., 245 Ky. 127, 53 S.W.2d 204 and Adams v. Com., 274 Ky. 714, 120 S.W.2d 237. So they are, but here more than isolated indiscreet acts were shown on the part of appellant with Woodrow. There was evidence he visited her during her husband's absence and ran from the house when her

husband returned and was out of breath when he reached Mrs. Bertram's home. The night before her husband was killed, he was seen by Mrs. Bertram to chase Woodrow away from his home. Appellant at times was seen out driving with Woodrow and there was testimony indicating that she secretly met him while she was separated from her husband. Then in January, 1955, Woodrow took up his abode in appellant's home following her husband's tragic death on May 14, 1954. This evidence is clearly competent to establish motive upon the part of appellant.

The judgment is affirmed.