### Chatt v. Commonwealth.

(Decided March 5, 1937.)

142

C. A. NOBLE, C. W. NAPIER and ELBERT STRONG for appellant.

B. M. VINCENT, Attorney General, and ROSCOE VINCENT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

In a mining camp called Ajax, shortly after 1:30 a. m., August 1, 1935, Price Chatt shot and killed Collie Lykins. Chatt was indicted for murder. At his first trial had on December 4, 1935, the jury failed to agree. He was tried again on March 14, 1936, was convicted of manslaughter, and his punishment fixed at five years in the penitentiary. His motion and grounds for a new trial were overruled, and from the judgment that followed this appeal is prosecuted.

### The Men Involved.

Slayer and slain had worked together in this mining camp and for the Ajax Coal Company for 11 years. Both were just past 30 years of age. Each was married, and they lived on the same side of the street, with but one house between them, which was occupied by a man named Ova Smith and his family.

Both slayer. and slain had musical talent. Chatt played the guitar and Lykins sang and they were accustomed to play and sing together for their own enjoyment and the entertainment of their friends. Being about the same age, working in the same mine, living practically side by side, and having similar musical tastes, naturally a warm friendship grew up between them.

### The Party.

Lykins had invited some of his relatives and friends for the evening of July 31, 1935, and he had procured some Old Quaker liquor, so his widow testifies, and some beer and possibly other things. The quantity of this liquor is disputed. Mrs. Lykins testifies. there were two quarts. Chatt testifies it was two pints.

As his guests for the evening, Lykins had his wife's brother, Lawrence Suffrage, his own brother, Estille Lykins and his wife, his uncle John Nichols, his cousins, Hargis Nichols and Harlan Nichols (sons of John), and his neighbor, Sam Childers.

Ova Smith lived next door, yet he was not among those present, and from the answer of Mrs. Lykins to question 36 we infer he was not wanted. This may yet appear to be of more significance than now.

In the early part of the evening some one asked Lykins to favor his guests by singing for them, and this called attention to the absence of his accompanist. Mr. Suffrage was hastily sent or came to the home of Mr. Chatt with an urgent request that he come at once and assist Lykins in the entertainment of the party. Chatt had retired for the night, but, in response to the urging of Suffrage, Chatt arose, dressed himself, took his pistol, and went over to the Lykins home, and Chatt's testimony is: ''We sat there drinking and playing and passing the bottle around.'' Soon there was coming from this Lykins home ''A sound of revelry by night.'' The effect produced leads us to believe Mrs. Lykins' estimate of the quantum of this liquor is correct.

According to the testimony of the witnesses, the effect of this liquor was to inspire rather than to intoxicate, for they all speak of the members of the party as ''drinking but not drunk.'' We are persuaded the word ''drunk'' was used by the witness as synonymous with ''comatosed,'' and that the idea they intended to convey is what is ordinarily expressed as ''drinking but not down.''

As the stock of unconsumed liquor in this Lykins home became less and less, the noisy manifestations to those outside of the part consumed grew more and more. Sam Childers had gone home early and was seated on his porch listening. C. E. Childers had come out on his porch. His wife was lying in bed with her head propped up looking and listening out the window. Mrs. Ova Smith was up and at her listening post. Mrs. Cora Robertson was standing in her doorway. Mrs. Martha Smith was listening too. So were Josie Hayes and Bertha Terry. All tense, all watchfully waiting. The party had first become hilarious, then loquacious, and finally pugnacious.

Lykins became angry at Suffrage and they got into a racket. Chatt separated them, and in doing so twisted the arm of Lykins, and incurred his wrath. Others were now aroused. Christian names, surnames, and nicknames were forgotten, and they referred not to each other except as "You G— d— s— of a b—."

Mrs. Chatt heard the brawl and came after Chatt, took him home, and he was arranging to go to bed, when Lykins came and asked him for a drink of liquor. Chatt explained to him he had none. Then Hargis Nichols came, and he accused Chatt of stealing a pint of whisky and demanded that he come and help hunt it.

Chatt and his wife started over to the Lykins' home, and at the gate met John Nichols, who advised them to go back. They started back, had stopped at the home of Ova Smith (the uninvited neighbor) and were talking to him when Lykins and Hargis Nichols returned and assaulted Chatt. A scuffle ensued, in which Chatt struck Lykins over the head with his pistol, whereupon Lykins announced that he would get his gun and kill the G— d— s— of a b—; that no one could hit him over the head and get away with it. About this time Chatt announced there were but two bad men in Perry county and he was both of them. Hargis Nichols disputed this, and insisted he was one of them. By this time about every one had announced his intention to kill every G— d— s— of a b— there. These multitudinous threats were proven with meticulous care, and treated as matters of grave importance, but we cannot see in them anything more than idle whisky talk and drunken braggadocio. Ova Smith hadn't attended the party and, not proposing to be annoyed by the resulting brawls, he announced his intention of "calling the law." The result would not have been different if a shower of ice water had fallen. It sobered every one. The tumult and the shouting died. The brawlers did depart. Each bethought himself of business elsewhere and hastened to attend to it. Hargis Nichols may still be running. He disappeared, and does not even appear as a witness. The same is true of Mr. Suffrage. Lykins was called by nature and retired to one of those small outbuildings made famous by the late Chic Sales.

### The Homicide.

Soon the lights came on in the commissary, and by

that all knew Mr. Reid, the superintendent, had come over for the purpose of calling the sheriff.

Chatt had lost his pistol in the roadway during the mêlée with Lykins and Hargis Nichols, but in a few minutes he found it and, hastening to the commissary, he tried to talk and bluff **Mr. Reid** out of calling the sheriff.

Reid now arose from the desk and began urging Chatt to go home. Chatt started backing out, evidently much alarmed, and asked Reid to go home and spend the night with him. While it is strange, yet whenever any one is suspected of being drunk, or thinks he is, he at once wants to get where he can be seen so that he can by his presence demonstrate his sobriety, and those who had attended this party began to gather at the commissary. Harlan Nichols came and was sitting there pretending to be reading a mechanical magazine as Chatt came backing past him. As he did so, Chatt pointed his pistol at Harlan Nichols and directed him not to follow him out. Not another word was spoken. Besides the principal actors, there were a number of bystanders, who simply stood with muscles tensed, agape and aghast, expecting something to happen.

Chatt continued to back towards the door, Reid and Harlan Nichols slowly walking after him and facing him. Lykins in the meantime had entered the commissary in a semiclad condition. No one had said a word. Chatt, who had now backed to within about three feet of the door wheeled about, whereupon he faced Lykins, who had slipped up behind him. Lykins grabbed Chatt by the wrists, seemingly in an effort to keep Chatt's gun pointed upwards. Harlan Nichols now grabbed Chatt from behind, and began to belabor him over the head with a three-cell flashlight. The weight and length of such an instrument is a matter of common knowledge. They are about ten or more inches long and weigh about one and a half, or more, pounds, such added length and weight resulting from the kind of lens with which it is fitted. Mr. Reid, the superintendent of the mine, was asked about this flashlight and he said, "I suppose you could have killed a man with it."

At or about the first blow, Chatt's pistol was discharged, the ball ranging up and striking no one. Chatt

and Lykins continued their struggle, and Nichols continued to hit Chatt as fast and as hard as he could with this flashlight. At about the third blow, and as these three struggling men passed through the commissary door, Chatt's pistol fired again and Lykins said, "I'm shot" and sank down dead. Then Chatt dropped his pistol.

Harlan Nichols testified he hit Chatt after the pistol fired the first time and that he hit him three times. The only dispute in the evidence is about whether Chatt was hit by the flashlight before or after the pistol fired the first time. It all happened so quick and so fast that it is not to be expected that any one can say with certainty just when he first hit him.

While the foregoing is a much abridged statement, it gives a fair picture of the situation at the time of this homicide, and we may extend certain parts of it later in this opinion.

### Grounds for Reversal.

Mr. Reid testified to this over Chatt's objection and exception, and we have for our own convenience italicized a portion of it:

"I was called to go and call the sheriff by Ova Smith to stop a racket in front of his house and I went over to the office and Ova Smith and Harlan Nichols followed me into the office. I left the door open, and went back to the middle room where the desk is and took the receiver down off the telephone and asked for John Combs, a deputy sheriff, and while I was holding the receiver, after Mrs. Combs had answered, Price Chatt came in at the door and said, '*Roy if you call that sheriff on me, I'll blow your blasted brains out.*' I set the telephone down on the desk and said, 'Chatt, what is the matter with you? What do you want to shoot me for?' And I talked him out of it. I said, 'What do you want to shoot me for, I haven't done anything to you,' and I rose up from the desk still talking to him and he started backing out of the middle door into the first room, and finally he said, 'Roy, if you are a friend to me, you'll go home with me and stay all night,' and he still had his pistol in his hand, and kept it on me and he kept backing back and I followed him to the front room and

when we got in there a short distance from the door Collie Lykins came in and as he came in through the door he grabbed Chatt's hand and they went into a scuffle.''

The above threat was admitted over Chatt's objection, and this same threat was proven by Sam Childers, Sherman Childers, Mrs. J. F. Combs, Harlan Nichols and Nancy Reid. When interrogation about this threat was first begun, Chatt objected, his objection was overruled, and he excepted. He usually repeated his objection each time the interrogation about this threat was resumed but not always. Having made one unsuccessful effort to keep out the evidence of this threat, he was not required to renew it each time the same or any other witness was interrogated about it. Cincinnati, N. O. & T. P. Ry. Co. v. Bennette, 134 Ky. 19, 119 S. W. 181; Standard Elkhorn Coal Co. v. Riggs, 219 Ky. 51, 292 S. W. 476; Brown's Adm'r v. Wilson, 222 Ky. 454, 1 S. W. (2d) 767; City of Hazard v. Eversole, 237 Ky. 242, 35 S. W. (2d) 313; Occidental Ins. Co. v. Chasteen, 255 Ky. 710, 75 S. W. (2d) 363.

Chatt denied having made any threat to kill Reid and testifies that he said this to Reid: ''Roy, don't call the law, I think everything is all right now.''

If in fact Chatt did make this threat, it was not addressed to Lykins, the man he afterwards killed, or to any one acting in concert with Lykins, but to an entire stranger. The admission of evidence of this threat Chatt claims was error. In support of this contention Green v. Com., 33 S. W. 100, 17 Ky. Law Rep. 943, Word v. Com., 151 Ky. 527, 152 S. W. 556, Fugate v. Com., 202 Ky. 509, 260 S. W. 338, and 30 C. J. p. 191, sec. 420, are cited.

In the Green Case, Green had killed his wife, Annie Green, and at or about the same time had killed Henderson Wakes, her paramour. The opinion sets out a number of errors, and among others was proof of threats by Green to kill Wakes. The court held these threats to kill Wakes were not admissible upon the trial of Green for killing his wife. These threats were apparently made by Green at a time remote from the killing of his wife, whereas the threat to kill Reid preceded the killing of Lykins by not more than a few seconds.

In Word v. Com., 151 Ky. 527, 152 S. W. 556, Word was on trial for killing Ed White, and this court reversed the judgment because evidence was admitted of his threat made some time before to kill Maude Tandy (White's stepdaughter). Again is this case distinguished by the intervening time, and the same is true of the threat by Fugate to kill Jesse Neace made some time before Fugate killed Noble for which Fugate was on trial, thus distinguishing the Fugate Case from this one.

This case is like Smith v. Com., 92 S. W. 610, 29 Ky. Law Rep. 231, where we held evidence of threat by Smith to shoot the children of Powel Logan was admissible upon the trial of Smith for killing Logan five minutes thereafter. There the court said: "We are of the opinion that it was proper for the court to admit this evidence. It was part of the difficulty, or transaction, which culminated in the homicide." The interval between the making of this threat and the homicide is too short and the connection between the two is too close to require that this evidence be excluded.

Chatt says he was so affected by the blows on his head by the flashlight he does not know whether he shot Lykins or not, or just what he did. All others say Chatt shot Lykins. There is no evidence any one else had a pistol and all the others present testify Chatt shot Lykins.

We find no error in the instructions.

The judgment is affirmed.