Gary Wayne DAVIS, Appellant,

v.

COMMONWEALTH OF KENTUCKY
Appellee.

No. 2002–SC–1092–MR.

Supreme Court of Kentucky.

Aug. 26, 2004.

As Modified on Denial of Rehearing
Nov. 18, 2004.

Marc S. Murphy, John Anthen Jeziorski, Stites & Harbison, Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Louis F. Mathias, Jr., Office of the Attorney General, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

James Edwin Cox was shot and killed at approximately 6:30 p.m. on November 13, 1998, while standing in front of his residence on Thomas Grove Road in Jefferson County, Kentucky. Immediately prior to the murder, Cox was talking to his brother on his cellular telephone. During that

conversation, Cox told his brother that a vehicle was driving slowly up and down his street, and that he was going to see what the driver wanted.[1] Cox then terminated the telephone call. Shortly thereafter, Cox was found dead with seven gunshot wounds to the head, back, and buttocks. At the time of his murder, Christina Levy, ex-wife of Appellant, Gary Wayne Davis, was residing with Cox. Levy was in North Carolina when the murder occurred.

A Jefferson Circuit Court jury subsequently convicted Appellant of murdering Cox, KRS 507.020, and of tampering with physical evidence, KRS 524.100, by attempting to dispose of Cox's body. The trial court sentenced Appellant to concurrent prison terms of fifty years for murder and five years for tampering with physical evidence. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), contending that the trial court erred by: (1) admitting irrelevant and prejudicial testimony about his relationship with his ex-wife; (2) admitting testimony about an unidentified bullet found in a vehicle leased to him at the time of the murder; (3) admitting unreliable scientific evidence about a tire track; (4) admitting evidence for which a proper chain of custody was not established; (5) denying Appellant's motion for a mistrial after the son of a juror was murdered during the course of the trial; and (6) refusing to direct a verdict of acquittal. Finding no reversible error, we affirm.

\* \* \* \* \* \*

Robert Rice, Cox's next-door neighbor, partially witnessed the murder. He heard a loud noise and went to a window to see what had happened. He saw a thin person entering a pickup truck in Cox's driveway. The person backed the truck out of the driveway and parked it on the grass in front of the fence separating the Rice and Cox properties. Rice noticed Cox lying on the grass in front of the truck propped up on his elbow with his head hanging down. The person exited the truck and shot Cox in the head, causing him to fall completely to the ground. The shooter next shot Cox in the buttocks. Rice heard a total of four to five shots, saw the truck back up toward the body, and then heard the truck's tailgate drop. Because he later observed the body lying in a different position than when he had seen it from the window, Rice surmised that the shooter had unsuccessfully attempted to load the body into the pickup truck. Rice could not determine with certainty the race or gender of the shooter, or the color, make, or model of the truck, except that the truck was dark in color.

The police suspected Appellant of Cox's murder because of Cox's relationship with Levy, who had divorced Appellant seven months before the murder. The police interviewed Appellant three times regarding his relationship with Levy and his activities on the day of the murder. Appellant did not testify at trial. However, the officers who had interviewed him recounted his alibi, and one of the statements that had been audiotaped was played for the jury. In his statements to police, Appellant described his activities on November 13, 1998, as follows:

Sometime between 5:00 and 6:00 p.m., he took his vehicle to a nearby Michel Tires store to purchase new tires. Because the tire store needed to keep his car overnight, he rented a dark blue extended-cab pickup truck from Enterprise Rent–A–Car. Appellant claimed that he planned to

---

1. At trial, Appellant argued that this evidence presented by Cox's brother should have been excluded as hearsay. The trial court admitted it under the present sense impression exception to the hearsay rule. KRE 803(1). Appellant does not pursue the issue on appeal.

use the truck for weekend travel with friends. He left Enterprise at about 6:00 p.m., returned home to get some exercise gear, and arrived at the gym between 6:30 and 7:00 p.m. He left the gym at approximately 8:00 p.m. Upon remembering that his sister's birthday party was that weekend, he decided to cancel his travel plans, and returned the rental truck to Enterprise. After returning home again, he drove to his place of employment, Caesar's casino in Indiana, where he worked from 8:45 p.m. until approximately 5:00 a.m. the next morning.

Documentation from Enterprise and Michel Tires indicated that Appellant rented the truck at 4:23 p.m. (not 6:00 p.m.), and took his car to Michel Tires at 5:00 p.m. A former Michel Tires employee testified that the tire store routinely finished tire-changing jobs in about forty-five minutes, and that the work order indicated a probable finishing time of 6:00 p.m. Further, the Enterprise employee testified that Enterprise normally closed for business at 7:00 p.m. and that Appellant returned the truck at approximately 7:15 p.m., not 8:00 p.m. Enterprise records showed that Appellant had driven the rental truck a total of 34 miles. Commonwealth's detectives who drove the route that Appellant described to police (from Enterprise to his apartment, to the gym, then back to Enterprise), measured the total distance at 11.9 miles; however, when combined with an additional 22 miles to and from the murder scene, the hypothetical route totaled 33.9 miles.

The Commonwealth also cast doubt on Appellant's claimed innocence by focusing on his behavior in the days and weeks following Cox's murder. Allen Hall, the Enterprise employee who rented the truck

to Appellant, testified that he took an imprint of Appellant's credit card, intending to charge the rental fee to Appellant's credit card company the next day. Appellant, however, called Hall the next morning and informed him that he had decided to pay in cash. Later that day, Appellant went to Enterprise, paid the rental fee in cash, and had the credit transaction voided. Appellant returned to Enterprise a few weeks later and attempted to "refresh" Hall's memory regarding the following matters: (1) that he had first requested a black Jeep Cherokee automobile instead of a truck;[2] (2) that he had wanted to pay in cash from the beginning; (3) that he had parked his company van at a lot across the street from the rental agency and placed a for-sale sign on it; and (4) that he returned the rental truck on the way home from the gym. Appellant informed Hall that it was extremely important for him to remember what he had just been told "for reasons that he couldn't get into." Before leaving, he gave Hall some coupons for use at Caesar's casino. Almost immediately after Appellant left, police officers arrived at Enterprise to question Hall about Appellant's rental transaction.

## I. OTHER CRIMES, WRONGS OR ACTS.

### A. Motion in limine.

The Commonwealth's theory was that Appellant's motive for killing Cox was his obsession with Christina Levy and jealousy of Cox's sexual relationship with her. In order to determine prior to trial whether it could prove this theory by evidence of specific instances of conduct, the Commonwealth served "Notice pursuant to KRE

---

**2.** As noted, *infra*, Appellant's ex-wife, Levy, owned a Jeep Cherokee. It could be inferred that Appellant wanted to rent an identical vehicle so that it would not arouse suspicion if it was seen at the victim's residence.

404(c)" of its intent to introduce at trial evidence of Appellant's almost life-long obsession with Levy and jealousy of Levy's relationships with other men, and a motion for an *in limine* ruling that such evidence was admissible. Because Appellant claims that the admission of this evidence was error and the Commonwealth claims that Appellant did not preserve the issue for appellate review, we repeat verbatim the evidence recited in the Commonwealth's pretrial notice and motion.

Ms. Levy and the defendant met in the 6th grade. Although they did not know each other well, the defendant admitted to Ms. Levy years later that he used to follow her home, unbeknownst to her, in the 6th grade. Ms. Levy and the defendant began dating during Ms. Levy's sophomore year at the University of Kentucky. After their relationship became sexual, the defendant became very possessive of Ms. Levy. In the Spring of 1986, Ms. Levy ended the relationship with the defendant. He began to shake and cry. He begged her to stay with him. He said he would do anything to remain with her. Shortly afterward, the defendant searched the crowd during the Derby Festival to find Ms. Levy's father. He proceeded to tell Mr. Levy that he was an unfit father and a bad example for Ms. Levy.

In the Summer of 1986, the defendant began waiting for Ms. Levy in the parking lot of her apartment complex during all hours of the night. He would blow his horn or yell at Ms. Levy when he saw her. He would ask her to talk with him or just sit in his car and listen to a song with him. On one occasion, Ms. Levy and a friend told the defendant they were having a girls night out. The defendant showed up at the bar. After one of Ms. Levy's friends called the defendant a stalker, the defendant left a box of personal items at Ms. Levy's

door. In the Fall of 1986, the defendant apologized to Ms. Levy for his bizarre behavior stating that he just wanted to be with Ms. Levy.

In the Spring of 1987, Ms. Levy and the defendant resumed their friendship. However, the defendant remained romantically interested in Ms. Levy. He asked her not to speak about her boyfriend, he attempted to hold her hand, and took other actions which clearly demonstrated to Ms. Levy that the defendant was still interested in a romantic relationship. On one occasion, the defendant called Ms. Levy to study. Ms. Levy told the defendant that she had guests. At 6:00 a.m. the following morning, the defendant knocked on her door looking disheveled and acting agitated. He disgustingly [sic] laughed when he saw Ms. Levy's boyfriend. Afterwards, the defendant refused to speak to Ms. Levy. The defendant wrote Ms. Levy a condemning letter. Ms. Levy and the defendant broke ties after this incident.

Ms. Levy married her first husband in 1989. In January 1991, the defendant contacted Ms. Levy's parents to ask for her phone number. Ms. Levy called the defendant and they began dating again. Shortly thereafter, Ms. Levy invited the defendant to her home while her husband was out of town. They resumed their physical relationship. Afterwards, Ms. Levy and the defendant began seeing each other regularly.

In early 1992, Ms. Levy moved to Lexington and the defendant followed. They were dating exclusively. On October 24, 1992, Ms. Levy told the defendant she was meeting her father for a birthday dinner. Instead, she went out with her husband. When the defendant discovered that she was with her husband, he threw Ms. Levy's husband's

clothes all over the house. He destroyed a picture that Ms. Levy had of her husband. Ms. Levy apologized and the defendant took her to dinner.

In January 1993, Ms. Levy was having dinner at her home with her boss. The defendant stormed into her home. He grabbed some of his clothes and on the way out made several derogatory remarks to Ms. Levy's boss. Ms. Levy followed the defendant outside. Once outside, the defendant put his hand around Ms. Levy's throat and slammed her against a wall. The defendant called to apologize an hour or so later.

In the Spring of 1993, Ms. Levy began working with the defendant at his business. Their relationship became strained due to financial difficulties and the defendant's overall treatment of Ms. Levy. Nonetheless, Ms. Levy agreed to marry the defendant in 1994. During this time frame, the defendant began opening and reading Ms. Levy's mail. On their honeymoon in early 1995, the defendant became so upset with Ms. Levy for smoking that he slammed his fist on a table, spilling red wine on Ms. Levy's white dress.

In April 1995, Ms. Levy began dancing at Gobels [a topless bar] to get back at the defendant for the way she felt he was treating her. Ms. Levy lied to the defendant telling him that she was working as a waitress. The defendant discovered that she was working at Gobels. Obviously, the relationship became even more strained. Ms. Levy began speaking of a separation.

In the summer of 1995, Ms. Levy met the victim, James Cox, while she was dancing at Gobels. Ms. Levy developed a friendship with the victim. At the same time, her relationship with the defendant was shattered. They separated for a while, but the defendant cried and begged Ms. Levy to stay with him. Their relationship was characterized by more frequent and violent arguments. The defendant often hit walls and broke household items during their fights. Finally, Ms. Levy quit working at Gobels. The defendant was upset, wondering how they would manage without the money Ms. Levy was making.

In December of 1995, Ms. Levy informed the defendant she wanted a divorce. They defendant cried and begged her to change her mind. The defendant convinced Ms. Levy to rethink her decision. During this conversation, the victim paged Ms. Levy. The defendant saw the page and became very upset. Later the defendant paged Ms. Levy; the numbers signifying their wedding date plus '666'. When Ms. Levy went home she discovered the defendant had left his wedding ring on the mantel, turned over all of the pictures of them and left a fire in the fireplace. The defendant knew that Ms. Levy was terrified of fire.

Despite this event, Ms. Levy stayed with the defendant while looking for a way to terminate the relationship. The defendant continued to tell Ms. Levy that he would not want to live without her. Ms. Levy needed money to break away from the defendant. She began working for an escort service in October of 1996. In December, the defendant discovered items, clothes and credit card slips indicating that Ms. Levy was working for an escort service. The defendant became extremely upset. He woke Ms. Levy up at 3:00 a.m. He was shaking and yelling at her. He threw boxes at her. He threatened to kill her. He stated that he would destroy her. He crashed his body into the closet doors tearing them down. He smeared blood on the front door as he left the apartment. As a result of this conduct, an

Emergency Protection [sic] Order was issued on December 9, 1996 to protect Ms. Levy from the defendant.

Despite the Emergency Protection Order, the defendant began calling Ms. Levy and begging her not to hang up on him. He would beg her not to leave him. He referred to the victim as "Jim Ox" stating that "he was the lowest form of humanity." The defendant continually called the victim names and stated that Ms. Levy was only there because of the victim's money. Ms. Levy employed a divorce attorney.

In February 1997, the defendant called Joy Cox, the wife of the victim. Ms. Cox told the defendant that the victim and Ms. Levy were having an affair. The defendant went to the victim's home. He watched the victim and Ms. Levy through the window. As the victim and Ms. Levy were going to bed, the defendant began banging on the door and screaming for Ms. Levy to come out because he wanted to talk with her. The defendant yelled, "how can you be with this old fat man. I know you don't love him. You said we would work on our marriage but you're always with this fat f——," Ms. Levy called the police. The victim chased the defendant off of his property with a butcher knife. When the police arrived they asked Ms. Levy to speak with the defendant. The defendant just cried and said, "you said you would work on us and you haven't."

The defendant began entering Ms. Levy's apartment and lighting candles to scare her. The defendant also went through her drawers often leaving them open. In the summer of 1997, Ms. Levy came home to find the defendant in her apartment. Ms. Levy had not given the defendant a key. Ms. Levy became extremely upset. The defendant admitted that this was not the first time he had entered her apartment without her permission.

On one occasion, the defendant went to Ms. Levy's mother. He began the conversation by saying that she had been a poor example for Ms. Levy. The conversation ended with the defendant on his knees begging her to help him restore the relationship with Ms. Levy.

Ms. Levy also began spending time with one of her escort clients, Lee Otto. Mr. Otto would leave messages on her answering machine telling her how wonderful she was and how much she was loved. The defendant knew the code to access Ms. Levy's messages. He began asking her who Lee was because he was listening to her answering machine messages. The defendant confronted Ms. Levy and Mr. Otto at an apartment complex. The defendant started yelling that Mr. Otto was with another man's wife. The defendant called Mr. Otto a "disgusting, dirty old man." The defendant also shouted derogatory remarks about the victim who was not present.

In October of 1997, Ms. Levy moved in with the victim. The defendant came to their home and left Ms. Levy's cats in the victim's garage. He did this unannounced and without the knowledge of Ms. Levy or the victim. In April 1998, the divorce between Ms. Levy and the defendant became final.

The defendant admitted much of the aforementioned plus much more in his taped statement to police on November 23, 1998. The defendant admitted that he caught Ms. Levy driving the victim's Mercedes while they were married. He acknowledged that he knew Ms. Levy was spending the night at the victim's home on several occasions in the 1996 time frame. The defendant further admitted that he confronted Ms. Levy's mother regarding Ms. Levy's activities

and their relationship. The defendant stated that when he discovered Ms. Levy was working for an escort service he became very angry. He acknowledged that he threw boxes, punched the door and yelled at her. The defendant further admitted that he contacted Joy Cox regarding Ms. Levy's relationship with the victim. He stated she told him that the victim and Ms. Levy were having an affair. After learning this information, the defendant acknowledged that he went to the victim's home and cased out the home for several hours. When Ms. Levy started to go to bed with the victim, the defendant admitted that he went to the door and a dispute ensued between himself and the victim. The defendant further stated that on several occasions afterwards he went to the victim's new house in Glenmary. The defendant stated that he frequently drove by and would, at times, park his car and watch the house. Further, the defendant admitted that he looked through Ms. Levy's documentation at her home. He discovered that she owned a new Jeep Cherokee and that she had a $30,000 boat in her name. The defendant even used Ms. Levy's financial account numbers to investigate her financial situation. He admitted that he was aware that Ms. Levy had deposited $40,000 in her checking account and that this money had come from Mr. Otto.

The defendant also acknowledged that he learned of Ms. Levy's relationship with Mr. Otto. He acknowledged that he discovered the connection between Ms. Levy and Mr. Otto because he would periodically check Ms. Levy's messages by using the access code which he remembered from when they lived together. The defendant stated that one of the messages from Mr. Otto concerned furniture from Haverty's. The defen-

dant contacted Haverty's Furniture stating that he was Lee Otto in order to find out the address to which the furniture was going to be delivered. The defendant went to Mallard Crossing to confront Mr. Otto and Ms. Levy. He stated, "Hello, I'm Gary Davis, I am the husband of the woman you have been s——ing." The defendant also asked if Mr. Otto knew the victim stating that Ms. Levy had been with him for two years. The defendant admitted that he suggested Mr. Otto and the victim get together to swap stories.

The defendant stated that he spoke with Ms. Levy four to six weeks after their divorce became final in August, 1998. He acknowledged that he referred to the victim as a liar and a cheat. He described the victim as a compulsive liar. He stated to Ms. Levy that she could not be in love with the victim and that she was only with him for his money.

Appellant filed a two-page response to the motion *in limine,* asserting that his confrontation with Levy and the victim at the victim's residence approximately sixteen months before the murder was too remote in time to be relevant. Otherwise, he did not address any specific fact proposed to be proven by the Commonwealth, but only argued:

> The Defendant objects to the Commonwealth's motion which seeks to retry and rehash salacious portions of his civil divorce proceeding with Christina Levy, the victim's paramour. The Commonwealth also seeks ... to go back in time as early as the defendant's sixth grade regarding what it perceives are significant events in the defendant's relationship with Christina Levy. This case should focus on the issue of the charged murder and the admissible evidence to prove that rather than an effort at prov-

ing "This Is Your Life." The Defendant's supposed "possessiveness," "surveillance," and confrontation of his former wife, Christina Levy and the victim do not add up to or equal murder or a permissible/admissible motive for murder....

Even if deemed "relevant" by this court, the Court should exclude the Commonwealth's proffered evidence regarding the marital history of the defendant, under the facts of this case, because its probative value is substantially outweighed by the danger of undue prejudice....

... The Commonwealth simply should not be permitted to interject such "character" evidence into the trial of this action to impermissibly prejudice the jury and buttress its case against the defendant.

Approximately one week after Appellant filed his response, the trial court entered a three-page opinion addressing the three-part test set forth in *Bell v. Commonwealth*, Ky., 875 S.W.2d 882, 889–91 (1994), *viz:* (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect? Noting that the evidence "provides information beyond 'character' evidence" in that it tended to prove identity, motive and Appellant's animosity toward Cox, the court found that all three requirements set forth in *Bell* were met. The order recites that "the Commonwealth's Motion to Introduce Evidence of Defendant's *Past History* with Christina Levy is GRANTED." (Emphasis added.) Thus, neither Appellant nor the trial court undertook an analysis of the relevancy of each individual fact proffered in the Commonwealth's motion. Instead, Appellant objected to the general nature of the evidence, *i.e.*, his past history with Levy, and the trial court deemed it relevant and ad-

missible. Of course, as explained *infra*, some facts set forth in the Commonwealth's motion were admissible and others inadmissible. Appellant did not move the trial court to amend the order to rule on any specific facts proffered by the Commonwealth.

### B. Trial.

At trial, Levy testified for more than two hours on direct examination, repeating the same facts and in the same chronological order as described in the Commonwealth's motion. She also testified to additional facts, some of which were both irrelevant and prejudicial, *e.g.*, that she became pregnant during her premarital affair with Appellant and terminated the pregnancy by abortion at Appellant's suggestion, that she received harassing hang-up telephone calls, insinuating that Appellant was the caller, and that she found flowers in her locked automobile that she believed Appellant had placed there. Appellant periodically objected to leading questions, improper opinion testimony, etc., but not to the relevancy of any particular fact pertaining to his history with Levy.

More than an hour into Levy's testimony and shortly after she had finished describing the incident that occurred during their March 1995 honeymoon when Appellant slammed his hand against a table causing red wine to spill on her dress, defense counsel approached the bench and made the following statement:

The court previously, pursuant to motion of the Commonwealth and hearing, is permitting this character testimony, which would otherwise not be admissible, over our objection. We want the record to reflect that we have a continuing objection to this testimony and that it is character and not properly before the court.

Counsel also moved for a mistrial or, in the alternative, that the jury be given a limiting admonition. The trial court overruled the objection and denied the motion for a mistrial. The trial court agreed to give a limiting admonition at the conclusion of Levy's testimony but did not grant counsel's apparent request for a "continuing objection" to the remainder of Levy's testimony. No further objections were made with respect to the relevancy of Appellant's past history with Levy.

At the conclusion of Levy's testimony, the trial court admonished the jury as follows:

> Members of the jury, at this time I want to give you the following admonition, that the testimony of Ms. Levy may be considered, if at all, only to infer a possible motive or intent or identity of Gary Davis as the individual who killed James Cox. The testimony may not be considered for any other purpose.

This admonition substantially resembled the one orally requested by defense counsel. There was no objection to the wording of the admonition. *Cf. United States v. Graydon,* 429 F.2d 120, 123–24 (4th Cir. 1970) (no reversible error where defendant failed to object to wording of Allen charge to the jury).

*C. Preservation of error.*

■■■ Defense counsel's "continuing objection" did not preserve error with respect to the admission of any particular fact to which Levy testified at trial.

> At the *request* of a party or on its own initiative, the trial court *may grant* a continuing objection to a line of questions by an opposing party, but, for purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions *clearly within its scope.*

75 Am.Jur.2d *Trial* § 402 (1991) (emphasis added). *See also State v. Larocque,* 268 Ga. 352, 489 S.E.2d 806, 808 (1997) ("[A] single objection constitutes a continuing objection only when counsel specifically requests a continuing objection and the trial court specifically grants a continuing objection, or when the trial court on its own initiative clearly designates an objection as continuing."); *Yankunos v. Hinds Catering Co.,* 130 Pa.Super. 187, 196 A. 520, 521 (1938) ("It is the duty of counsel to object to the introduction of testimony as it is offered, unless from the record it clearly appears that the rulings made as to particular questions shall be applicable to all questions asked on the same subject matter and to all witnesses called."). Thus, continuing objections are appropriate when the claim of error is that the witness is incompetent to testify to anything, *e.g., People v. Rogers,* 348 Ill. 322, 180 N.E. 856, 857 (1932) (marital privilege); that out-of-court statements of the same declarant violate the hearsay rule, *e.g., Sanchez v. United States,* 293 F.2d 260, 264–65 (8th Cir.1961) (defendant, who clearly expressed that he was objecting to all conversations between government agent and informant on hearsay grounds, was not required to repeat objection to each statement); or that the same irrelevant evidence is inadmissible when repeated by different witnesses, *e.g., Chatt v. Commonwealth,* 268 Ky. 141, 103 S.W.2d 952, 954 (1937) (evidence that defendant threatened third-party). However, it is generally inappropriate to grant a continuing objection to issues pertaining to multiple offers of evidence under KRE 404, which generally, must be individually balanced pursuant to KRE 403. *United States v. Mangiameli,* 668 F.2d 1172, 1177 (10th Cir.1982) ("considerations bearing upon a decision whether to admit or exclude evidence under [those rules] are sufficiently complex that ordinarily neither counsel nor the trial

court should rely on a [continuing] objection").

■ Here, the trial court did not grant defense counsel a continuing objection and, obviously, each fact to which Levy testified would weigh differently under KRE 403, *e.g.*, Levy's testimony with respect to Appellant's prior threats, violence and animosity toward the victim, Cox, as opposed to evidence of Appellant's prior threats and violence towards Levy, herself. Generally, evidence of prior threats and animosity of the defendant against the victim is admissible as evidence of motive, intent or identity, *e.g.*, *Goodman v. Commonwealth*, Ky., 285 S.W.2d 146, 149 (1955), whereas evidence of prior threats or violence against an unrelated third-party is generally regarded as inadmissible character evidence, *e.g.*, *Fugate v. Commonwealth*, 202 Ky. 509, 260 S.W. 338, 341 (1924). Thus, a continuing objection to all of Levy's testimony, part of which was clearly admissible and part of which was probably inadmissible, would not preserve any error with respect to the inadmissible parts. Otherwise, a party could preserve error by simply making a continuing objection to all evidence offered by the adverse party without pointing out to the trial court which facts should be excluded and why.

The issue now becomes whether any errors occurring during Levy's testimony were preserved because of the trial court's ruling on the Commonwealth's motion *in limine*. KRE 103(d) provides:

A motion in limine resolved by order of record is sufficient to preserve error for appellate review.

■ The Commonwealth naturally relies on *Tucker v. Commonwealth*, Ky., 916 S.W.2d 181 (1996). In *Tucker*, another murder case, the defendant made a motion *in limine* to prohibit the introduction of evidence "'concerning the events surrounding the charge of first-degree robbery and kidnapping against Pedro McKee in Fayette Circuit Court.'" *Id.* at 183. The motion was overruled. At trial, McKee testified without objection not only that he and Tucker had participated in the previous robbery and kidnapping, but also that Tucker had wanted to kill the victim of those crimes to eliminate the witness, but that McKee had dissuaded him. We held that the latter fact was not within the scope of the motion *in limine*.

An objection made prior to trial will not be treated in the appellate court as raising any question for review which is not strictly within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection. *It must appear that the question was fairly brought to the attention of the trial court....* One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of.

*Id.* at 183 (emphasis added).

■ Usually, a motion *in limine* requests an advance ruling on a specific evidentiary fact, not a theory of the case requiring proof by multiple facts. Where a party specifies what evidence should be suppressed and why, the question has been "fairly brought to the attention of the trial court" and the trial court's ruling preserves the issue for appeal. In that scenario, the opponent of the evidence need not object when the same evidence is offered at trial.[3] However, the same principle does not apply to broad, generic objections. For example, it is unclear from the *Tucker* opinion that the motion *in limine* related to the defendant's stated intent to

3. It should be noted that KRE 103(d) does not require the trial court to make a pretrial ruling but authorizes the court to "defer a decision until the evidence is offered at trial."

kill the victim so as to leave no witnesses in the prior case or whether it related only to a claim that the facts of the prior offense were insufficiently similar to the charged offense to establish a *modus operandi* showing that he committed the charged offense. *See Billings v. Commonwealth*, Ky., 843 S.W.2d 890, 893 (1992). This case is like *Tucker* in that Appellant objected to the presentation of any evidence supporting the Commonwealth's theory of the case without specifying any other reason why a particular fact should be suppressed. After the trial court overruled his broad objection to the Commonwealth's theory, he was required to object at trial to those facts he deemed inadmissible for other reasons and explain to the trial court, if requested, his grounds for that belief. KRE 103(a)(1). Nevertheless, because Appellant may have been misled by the unambiguous language of KRE 103(d), and to avoid a possible claim of ineffective assistance of counsel on this issue, RCr 11.42, we will address its merits.

### D. Admissibility.

■ Appellant contends that Levy's testimony regarding their longstanding relationship violated KRE 404(b)'s proscription against the use of other crimes, wrongs, or acts to prove character, sometimes referred to as "propensity," in order to show action in conformity therewith.[4] Since Appellant did not specifically object to the relevancy of any of the "past history" testimony at trial, but relied on the trial court's previous order overruling his objection to the *in limine* motion, we need not consider any of Levy's testimony that was not recited in that motion. Nevertheless, that evidence was a hybrid of admissible and inadmissible testimony. We note at the outset that KRE 404(b) is not limited to other acts that are criminal or unlawful, but applies to any acts offered to prove character in order to show action in conformity therewith. Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[2], at 125 (4th ed. LexisNexis 2003).

■ The proscription in KRE 404(b) does not apply to evidence that is probative for a purpose other than proving a person's character in order to show action in conformity therewith. *See, e.g., Billings v. Commonwealth*, 843 S.W.2d at 893. KRS 404(b)(1) enumerates some of those "other purposes," including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. However, "the listed purposes are illustrative rather than exhaustive." Lawson, *supra*, § 2.25[5], at 151. *See, e.g., Adkins v. Commonwealth*, Ky., 96 S.W.3d 779, 793 (2003) (evidence of lying to police officer admitted to show consciousness of guilt); *Bray v. Commonwealth*, Ky., 68 S.W.3d 375, 384 (2002) (flight from country used to show consciousness of guilt); *Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 450 (1999) (evidence of defendant's willingness to participate in other three-person sex acts used to rebut defendant's claim that homicide victim forced her to participate in such acts). Thus, we apply the three-part test set forth in *Bell v. Commonwealth*, *supra*, to determine admissibility:

### (1) Relevancy.

■ Evidence of Appellant's extreme obsession with Levy and jealousy of any other man with whom Levy had a social

---

4. Appellant does not assert that the evidence in question is prohibited as habit evidence, *i.e.*, that he always reacted with jealousy and violence upon learning that Levy had a social relationship with another man. Habit evidence is not permitted in Kentucky. *Burchett v. Commonwealth*, Ky., 98 S.W.3d 492 (2003).

724

or sexual relationship fell within the "other purpose" exception because it tended to prove a motive for Appellant to kill Cox. *See People v. Ranstrom,* 304 Ill. App.3d 664, 237 Ill.Dec. 638, 710 N.E.2d 61, 69 (1999) ("We conclude that the attack on [the victim] would be difficult to explain without introducing a substantial amount of the evidence concerning defendant's obsessive behavior toward [the defendant's ex-girlfriend]."); *State v. Nance,* 148 N.J. 376, 689 A.2d 1351, 1357 (1997) ("although [defendant's ex-wife] was not the victim of the homicide, defendant's jealousy toward her can establish a proper motive to explain why defendant acted the way he did against [victim], who had a good relationship with [her]"). In *Price v. Commonwealth,* Ky., 31 S.W.3d 885 (2000), we recognized the validity of third-party obsession evidence in a different context. The Commonwealth's theory in *Price* was that the defendant was sexually obsessed with his stepdaughter whom he had raped, and that he murdered his wife because she was an obstacle to his continued relationship with his stepdaughter. We upheld the trial court's refusal to sever the murder charge from the rape charge, as evidence of the rape would have been admissible in the murder trial to prove Appellant's motive of sexual obsession. *Id.* at 889.

Evidence that Appellant's behavior, which dated back to the sixth grade, continued through college, during Levy's first marriage, and even after the failure of Appellant's own marriage to Levy, illustrated the magnitude of his obsession. *Ranstrom,* 237 Ill.Dec. 638, 710 N.E.2d at 69 (refuting defendant's argument that trial court should have limited the evidence presented regarding his obsession). Levy testified at trial that she had never known or heard of Appellant even dating any woman other than herself. No doubt, evidence of Appellant's violent reactions to

Levy's relationships with Otto and Cox, and even more so to her merely dining with her first husband and her employer, reflected negatively on Appellant's character. However, the evidence illustrated his animosity toward any man whom he suspected of receiving Levy's affection or attention. *Cf. Huff v. Commonwealth,* 275 Ky. 578, 122 S.W.2d 143, 145 (1938) (evidence that accused became incensed upon having his property attached and his wages garnished and said that he would kill anyone who undertook to attach his property admissible to prove motive to kill victim who caused attachment to issue against accused's property). Conduct demonstrating Appellant's jealousy-driven animosity toward Cox was especially relevant since Cox was the victim in this case. *See, e.g., Todd v. Commonwealth,* Ky., 716 S.W.2d 242, 249 (1986) (evidence of accused's alleged prior assaults on victim admissible to prove " 'state of feeling' " between the two and thereby establish motive).

A factor to consider in determining whether evidence is admissible to prove motive depends on whether the issue of motive is in actual dispute. Lawson, *supra,* § 2.25[3][b], at 127. Here, the defense was complete denial. Although a jury could infer a level of obsession and jealousy with respect to Levy from Appellant's own audiotaped statements, that level was nowhere near the magnitude illustrated by Levy's testimony.

*(2) Probativeness.*

 This aspect of the *Bell* test relates to whether there is sufficient evidence that the "other crime, wrong, or act" actually occurred. *Bell,* 875 S.W.2d at 890; Lawson, *supra,* § 2.25[3][c], at 130. The issue is resolved under KRE 104(b) ("conditional relevance") by admitting the evidence if the jury could reasonably conclude that

the act occurred and that the defendant was the actor. *Id.* at 131. *See also Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988); *Parker v. Commonwealth,* Ky., 952 S.W.2d 209, 214 (1997). Appellant's claim that the evidence was insufficient to prove that he was the person who placed the cats in Cox's garage fails. Levy testified that Appellant had been awarded the cats in their divorce settlement. Further, Cox's aunt, Shirley Carroll verified that this incident occurred.

*(3) Prejudice.*

■■■■ Although relevant and probative, the evidence can still be excluded if its probative value is substantially outweighed by its prejudicial effect. KRE 403. A trial court's decision with respect to the KRE 403 balancing test is reviewed for abuse of discretion. *Johnson v. Commonwealth,* Ky., 105 S.W.3d 430, 438 (2003); *Commonwealth v. English,* Ky., 993 S.W.2d 941, 945 (1999). We discern no abuse of discretion here. As noted above, Levy's testimony was crucial to the Commonwealth's case because it proved that Appellant had a motive to kill Cox. Lawson, *supra,* § 2.25[5], at 146 (need for evidence proving motive is greatest and relevance is clearest when defense is denial of criminal act); *cf. Williams v. Commonwealth,* Ky., 810 S.W.2d 511, 513 (1991) (Commonwealth's need for evidence relevant to decision whether to admit defendant's mug shots). Additionally, the admonition given by the trial judge in this case substantially mitigated the prejudicial effect of the evidence. Lawson, *supra,* § 2.25[3][d], at 135. ("[T]he 'prejudice' component of the balancing formula can be affected by admonitions."). *See Young v. Commonwealth,* Ky., 25 S.W.3d 66, 73 (2000) (admonitions substantially reduce the prejudicial impact of evidence of uncharged acts).

■■■■ We also reject Appellant's argument that the events Levy described were too remote in time to be relevant. The Commonwealth used testimony about Appellant's longstanding relationship with Levy to establish that his obsession with her motivated him to kill Cox. Generally, temporal remoteness is a factor in determining admissibility but is not grounds for exclusion; remoteness bears more heavily on weight than on admissibility. *English,* 993 S.W.2d at 944; *State v. Lloyd,* 354 N.C. 76, 552 S.E.2d 596, 610 (2001) ("remoteness in time is less significant when the prior conduct is used to show ... motive ...") (internal quote omitted). This inquiry is fact-intensive and not governed by a strict bright-line standard. 29 Am.Jur.2d *Evidence* § 416 (2003) ("But there is no absolute rule regarding the time that can separate the extraneous acts from the charged offense; rather, the court applies a reasonableness standard and examines the facts and circumstances of each case."). *See also Robey v. Commonwealth,* Ky., 943 S.W.2d 616, 618 (1997); Lawson, *supra,* § 2.25[3][b], at 129–30. As Appellant's obsession with Levy spanned many years, the Commonwealth was entitled to introduce temporally remote evidence to show the magnitude of his obsession and to dispel any notion that it might suddenly subside. *Fleenor v. Commonwealth,* 255 Ky. 526, 75 S.W.2d 1, 2 (1934) (evidence of defendant's conduct two years prior to murder was not too remote in time as "there was evidence that bad feelings had existed between the [defendant and victim] since that date"). *See also Lear v. Commonwealth,* Ky., 884 S.W.2d 657, 660 (1994) ("The remoteness in time of uncharged acts is a concern which must be carefully weighed as a part of a trial court's decision. Those concerns are, however, tempered when the acts in question so clearly show such a well-de-

726

fined continuous pattern of conduct.");
*United States v. Dickerson,* 248 F.3d 1036,
1046 (11th Cir.2001) ("principles governing
... other crimes evidence are the same
whether the conduct occurs before or after
the offense charged" (internal quotes omit-
ted)).

 Also, portions of Levy's testi-
mony, even if inappropriate, were harm-
less. Specifically, Appellant asserts that
evidence of (1) his violent outburst upon
discovering that Levy was a prostitute,
which prompted Levy to obtain an EPO
against him, and (2) the incident on their
honeymoon when he slammed his hand on
a table because Levy wanted to smoke a
cigarette, spilling a glass of wine on
Levy's dress, was relevant only to prove
his character for violence. The prejudicial
effect of evidence that a husband reacted
violently upon learning that his wife was a
practicing prostitute is doubtful at best.
Nevertheless, Appellant's own admission
of that reaction and that Levy obtained an
EPO against him in his audiotaped state-
ment to the police, which he does not
challenge on appeal, rendered Levy's tes-
timony in that respect cumulative and,
thus, harmless. *See Allgeier v. Common-
wealth,* Ky., 915 S.W.2d 745, 747 (1996)
(harmless error occurred where testimony
to which defendant objected essentially
duplicated that offered without objection
by another witness); *Chumbler v. Com-
monwealth,* Ky., 905 S.W.2d 488, 494
(1995) (evidence that accused was in jail
harmless because same evidence was elic-
ited from another witness without objec-
tion); *Lair v. Commonwealth,* Ky., 330
S.W.2d 938, 940 (1960) (evidence that ac-
cused had committed more than one of-
fense harmless because evidence that he
had committed other similar offenses had

already been admitted without objection).
That leaves only the honeymoon incident,
*i.e.,* that on an occasion more than three
and a half years prior to the murder,
Appellant reacted angrily to his wife's de-
sire to smoke a cigarette. We review the
admission of that evidence for harmless
error, RCr 9.24, and easily conclude that
the exclusion of that evidence alone would
not have changed the outcome of the case.
*Abernathy v. Commonwealth,* Ky., 439
S.W.2d 949, 952 (1969), *overruled on other
grounds by Blake v. Commonwealth,* Ky.,
646 S.W.2d 718, 719 (1983).

 Appellant also contends that
evidence that Levy feared him and that
her friends referred to him as "the stalk-
er" was irrelevant. However, evidence of
Appellant's stalking of Levy was relevant
to prove his obsession with her, thus tend-
ing to prove his motive to kill Cox. Appel-
lant also admitted in his own statement,
the admissibility of which he does not chal-
lenge, that he "played Columbo"[5] by moni-
toring Levy's activities. He raised no
hearsay objection to "the stalker" evi-
dence. Nor was evidence of Levy's fear
prejudicial. It logically followed from her
testimony about Appellant's violent reac-
tions to her relationships with other men
and that Appellant would follow her and
enter her home without permission.
*Fields v. Commonwealth,* Ky., 12 S.W.3d
275, 284 (2000).

Finally, Appellant argues that the trial
court erroneously admitted Levy's testimo-
ny as evidence of modus operandi. How-
ever, a review of the court's *in limine*
order and admonition to the jury reveals
that the court did not admit Levy's testi-
mony as evidence of modus operandi,
mooting this argument.

**5.** Columbo was the title character in a televi-
sion show about a detective that aired during
the 1970's. http://www.museum.tv/ar-
chives/etv/C/htmlC/columbo/columbo.htm
(last visited April 6, 2004).

## II. IDENTIFICATION OF REAL EVIDENCE.

Kenneth McClain, an Enterprise employee, testified that on the day after the murder, he cleaned the truck that Appellant had rented and, while doing so, found a bullet in the wash bay. After telling another employee about the bullet, he discarded it. He did not know the caliber of the bullet but testified that it was larger than the 9–mm bullet displayed to him by the prosecutor at trial. (Cox was shot with .38 caliber bullets, which are larger than 9–mm bullets). Relying on the Commonwealth's inability to produce the bullet, Appellant asserts that McClain's testimony should have been excluded because the bullet was insufficiently linked to the crime. We disagree.

■ The failure to produce the bullet, standing alone, is not fatal to McClain's testimony. *Evans v. State*, 643 N.E.2d 877, 880 (Ind.1994) (jailer's testimony that he found bag of white powder residue in defendant's pocket admissible even though State lost the bag and failed to test the powder; absence of bag affected weight rather than admissibility). A witness can testify to what was observed even if unable to positively identify each aspect of it. Thus, McClain's testimony that he found a bullet larger than a 9–mm bullet while cleaning the vehicle that Appellant had rented the previous evening was admissible if relevant to the charges against Appellant.

■ Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more ... or less probable than it would be without the evidence." KRE 401. As McClain's testimony concerns demonstrative, or real, evidence (though absent), it is relevant if the evidence can be properly identified, Lawson, *supra*, § 11.00[2][c], at 842–43, *i.e.*, linked to the crime by time, place, and circumstance. *Cook v. Commonwealth*, Ky., 401 S.W.2d 51, 53 (1966). "The proof need not positively show the connection; but there must be proof rendering the inference reasonable or probable from its nearness in time and place or other circumstances." *Barth v. Commonwealth*, Ky., 80 S.W.3d 390, 402 (2001) (quoting *Higgins v. Commonwealth*, 142 Ky. 647, 134 S.W. 1135, 1138 (1911)). *See also* KRE 901(a) (evidence must be "sufficient to support a finding" of a link between the demonstrative evidence and the case).

■ The bullet was linked to the crime by time because McClain found it while cleaning the truck the day after the murder. The bullet was also linked to the crime by place. A reasonable inference from the testimony of Appellant's brother and Robert Rice was that the perpetrator fired some of the shots at Cox from inside the truck, making the truck part of the crime scene. Finally, the bullet was linked to the crime by circumstance. To identify Appellant as the shooter, the Commonwealth presented evidence of his lack of familiarity in handling guns. The victim was shot seven times. In addition to seven empty shell casings, five live rounds were found at the scene. A firearms expert explained that if a person unfamiliar with guns were shooting an automatic weapon, he might not know that racking the weapon would expel live rounds instead of spent cartridges. "Racking" involves pulling the gun's slide backwards. According to the expert, certain non-automatic guns require the operator to rack the gun between shots in order to reload the chamber and expel the spent casing. However, racking between shots is unnecessary with automatic guns; thus, instead of expelling a spent casing, racking expels a live round. Another police officer testified that when he asked Appellant what he

knew about guns, Appellant replied that he knew very little, and then made a racking gesture. The firearms expert theorized that Cox's murderer expelled six live rounds (one between each of the seven shots). Five were found at the scene, and one could draw a reasonable inference that the sixth was the bullet found in the Enterprise wash bay.

While these links are not conclusive, the rules of evidence do not require them to be. *Barth,* 80 S.W.3d at 402. Additionally, Mike Hammond, one of McClain's co-workers, testified that McClain told him about finding the bullet, yet Appellant does not challenge the admissibility of Hammond's testimony. Because sufficient evidence linked the bullet to Appellant and because he does not challenge Hammond's testimony, *Chumbler,* 905 S.W.2d at 494, no reversible error occurred in admitting evidence of the bullet.

### III. TIRE TREADS: DAUBERT.

Tire expert, William Bodziak, testified that a tire track from the crime scene possibly matched the tires on Appellant's rental truck. On appeal, Appellant challenges the admissibility of Bodziak's testimony because the trial court failed to hold a *Daubert* hearing, *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592–95, 113 S.Ct. 2786, 2796–98, 125 L.Ed.2d 469 (1993), to determine its reliability. He further argues that Bodziak's testimony did not meet the standards set forth in *Daubert.*

▪▪▪ Appellant did not request a *Daubert* hearing. While he objected to Bodziak's evidence, he did not do so on grounds that Bodziak's method of comparison was scientifically unreliable; he objected because Bodziak was unable to state with certainty that the tire track left at the scene was a unique match to the tire on the truck rented by Appellant. Thus, this

issue is unpreserved and reviewable only for palpable error. RCr 10.26. We have previously held that the failure to conduct a *Daubert* review does not amount to palpable error, *Tharp v. Commonwealth,* Ky., 40 S.W.3d 356, 368 (2000), and we decline to "speculate on the outcome of an unrequested *Daubert* hearing . . . ." *Id.*

### IV. CHAIN OF CUSTODY.

Appellant next claims that the trial court erroneously admitted into evidence pieces of Cox's clothing, Cox's eyeglasses, and the shell casings, absent a proper chain of custody. Appellant claims that the items were admitted too early in the trial, as Dawn Katts, who received the items at the crime laboratory, had not yet testified at the time of their admission.

▪▪▪ This argument is meritless. First, Katts later testified that she received the items, and Appellant is unable to explain how the earlier admission of the items prejudiced him. Second, the items were properly identified absent Katts's testimony. "A break in the chain of custody is not necessarily fatal to the admissibility of physical evidence." *Grundy v. Commonwealth,* Ky., 25 S.W.3d 76, 79 (2000) (internal quotes omitted). So long as evidence supports a finding that the objects are what their proponent claims, the requirement of identification is satisfied. KRE 901(a). Detective Kenneth Heavrin testified that he packaged the items and delivered them to Katts at the crime laboratory, and Appellant suggests no reason to believe that the evidence was altered or confused. Additionally, when evidence is readily identifiable, sufficiently unique, and impervious to change, the trial court has even greater discretion in admitting it absent evidence of a complete chain of custody. *Grundy,* 25 S.W.3d at 80. As Cox's belongings and the shell casings were not susceptible to alteration and were

readily identifiable, the trial court properly admitted them into evidence. *See, e.g., id.* (piece of concrete used to assault victim impervious to change); *United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir.1988) (sweatshirts properly admitted despite break in chain of custody).

## V. MURDER OF JUROR'S SON.

 During the course of the trial, the son of one of the jurors was shot and killed in a cemetery. The trial court excused the juror as an alternate. However, another juror learned of the shooting and informed other jurors about it. Appellant moved for a mistrial and alternatively requested that the judge individually question each juror as to whether the incident would affect his or her impartiality. The trial judge denied the motion for a mistrial, but questioned the jurors as requested, generally asking, "One juror has suffered a tragedy yesterday. Is there anything about this occurrence, or any discussion regarding this occurrence, that would affect your ability to sit impartially in this case?" All of the jurors responded that they could still adjudicate the case impartially. Appellant now argues that since both Cox and the juror's son died by gunshot, the trial judge should have granted a mistrial because the jurors might potentially use Appellant as a scapegoat or as a means of obtaining revenge for the death of their fellow juror's son.

 A mistrial is warranted only in extraordinary circumstances. *Maxie v. Commonwealth*, Ky., 82 S.W.3d 860, 863 (2002). Because all of the remaining jurors stated that they were capable of deciding the case impartially despite the tragic death of another juror's son, the trial court properly exercised its discretion in denying Appellant's motion for a mistrial. "It is the impact exposure to information has upon a person which is determinative, not the exposure itself." *Gould v. Charlton Co.*, Ky., 929 S.W.2d 734, 739

(1996). Also, even in cases where a juror's own friend or relative has been the victim of a crime, the judge need not strike that juror for cause. *Woodall v. Commonwealth*, Ky., 63 S.W.3d 104, 118 (2001) (no need to strike for cause juror whose sister had been raped); *Butts v. Commonwealth*, Ky., 953 S.W.2d 943, 945 (1997) (no need to strike for cause juror who had been raped but expressed ability to be impartial). Here, the potential for prejudice was even more attenuated, as the other jurors did not even know the juror's son. It matters little that the death of the juror's son occurred *during* trial; even in situations where jurors have been improperly exposed to media coverage during trial, a mistrial is unwarranted unless the moving party demonstrates actual prejudice. *Byrd v. Commonwealth*, Ky., 825 S.W.2d 272, 274–75 (1992) (standard where publicity is not inherently prejudicial or unusually extensive), *overruled on other grounds by Shadowen v. Commonwealth*, Ky., 82 S.W.3d 896, 897–98 (2002). Since Appellant failed to prove actual prejudice, the trial court properly denied his motion for a mistrial.

## VI. SUFFICIENCY OF THE EVIDENCE.

 Arguing that the Commonwealth's case against him consisted solely of circumstantial evidence, Appellant contends that the trial court erred by denying his motion for a directed verdict of acquittal. However, circumstantial evidence may form the basis for a conviction so long as the evidence is sufficient to convince a reasonable jury of guilt. *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111, 114 (1994). The evidence in this case was sufficient for that purpose. Levy's testimony established motive, Appellant's jealous obsession over her, and his consequent animosity toward Cox, who was her boyfriend. While Rice, the only eyewitness, could not positively identify the shooter by

race or gender, he testified that the shooter drove a dark pickup truck. Appellant, himself, conceded that he was in possession of a rented dark blue pickup truck when Cox was murdered. The truck's odometer showed that Appellant had driven 34 miles, and that the distance from the rental agency to Appellant's residence, to the gym, to the murder scene, then back to the rental agency was 33.9 miles. A tire expert testified that the rental truck's tires were consistent with the tracks left at the crime scene. An employee of the rental agency found a bullet in the wash bay while cleaning the truck on the day after the murder. While Appellant strongly contests this witness's credibility, it is the prerogative of the jury to judge credibility. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991).

The bullet found in the wash bay accounts for the live round of ammunition missing from the crime scene. Additionally, Appellant's admitted unfamiliarity with firearms and the racking gesture he made when asked about his knowledge of guns is consistent with the Commonwealth's theory that the shooter unnecessarily racked the gun between shots, explaining the five live rounds found at the scene and the sixth round found in the wash bay. This theory's dependence on whether the shooter used an automatic weapon and the Commonwealth's inability to locate the weapon are irrelevant; on a motion for a directed verdict, the trial court must draw all fair and reasonable inferences in favor of the Commonwealth. *Id.*

Appellant's attempts to conceal evidence also create an inference of guilt. *See Smith v. Commonwealth,* Ky., 712 S.W.2d 360, 361 (1986) (destruction of evidence indicative of guilt). The morning after the murder, he returned to the rental agency to pay cash for the rental and had the rental fee removed from his credit card account. Weeks after the murder, on the same day that police were scheduled to speak with the person who had rented him the truck, Appellant again returned to the agency and asked that person to "remember" a few key details for him, then rewarded that person with free coupons to use at Caesar's casino. A reasonable jury could interpret this evidence as indicative of a consciousness of guilt.

Accordingly, Appellant's convictions of murder and tampering with physical evidence and the sentences imposed therefor are AFFIRMED.

LAMBERT, C.J.; GRAVES, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

KELLER, J., concurs in part and dissents in part by separate opinion, with STUMBO, J., joining that opinion.

Opinion by Justice KELLER, concurring and dissenting in part.

I believe that under the clear and unambiguous language of KRE 103(d), i.e., "[a] motion in limine resolved by order of record is sufficient to preserve error for appellate review," errors occurring during Levy's testimony were preserved by the trial court's order overruling Appellant's objections to the Commonwealth's motion in limine, and, therefore, to the extent that *Tucker v. Commonwealth*[1] holds otherwise, it should be overruled. Accordingly, I dissent as to Part I(C) (Preservation of error) of the majority opinion; otherwise, I concur.

STUMBO, J., joins this opinion, concurring in part and dissenting in part.

---

1. Ky., 916 S.W.2d 181, 183 (1996).