RENDERED:  MARCH 27, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0536-MR

JEFFREY L. RINEY, M.D., &
ASSOCIATES, PLLC; AND JEFFREY
L. RINEY, M.D.                                           APPELLANTS


              APPEAL FROM MCCRACKEN CIRCUIT COURT
v.        HONORABLE WILLIAM ANTHONY KITCHEN, JUDGE
                   ACTION NO. 20-CI-00282


PEGGY CROUCH, IN HER
CAPACITY AS EXECUTRIX OF THE
ESTATE OF JAMES CROUCH; AND
PEGGY CROUCH                                              APPELLEES


                          OPINION
                          AFFIRMING

                      ** ** ** ** **

BEFORE:  A. JONES, L. JONES, AND KAREM, JUDGES.

JONES, L., JUDGE:  This appeal involves a claim of medical negligence against

Jeffrey L. Riney, M.D. (Dr. Riney) and Jeffrey L. Riney, M.D. & Associates,

PLLC (collectively referred to as Appellants).  Following trial, the jury returned a

verdict against Appellants in the amount of $1,423,501.30. Appellants filed a motion seeking a new trial or, in the alternative, to alter, amend, or vacate the judgment by striking the award of $443,501.30 in medical fees and expenses. The trial court denied Appellants' motion, and this appeal followed. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Dr. Riney is a family medicine practitioner and was the primary medical provider for James Crouch (Crouch) from 2011 until Crouch's death on June 20, 2019, at seventy-eight years of age. Crouch was diagnosed with stage IV prostate cancer in April of 2019 after suffering a fall which led to his hospitalization. The fall resulted in a fracture to Crouch's hip. This fracture was repeatedly described as "pathologic" in Crouch's medical records, including those prepared by Dr. Riney, and was attributed to the weakening of Crouch's bones due to the spread of prostate cancer throughout his body.

When tested at the hospital, Crouch's prostatic-specific antigen (PSA) level was 303. A normal PSA range is between 1 and 4. A change in PSA levels of more than .75 in a year is strongly indicative of prostate cancer, and a PSA over 20 suggests stage IV cancer. The parties agree prostate cancer is the most common cancer occurring in men and can be cured if detected and treated early. For these reasons, family medicine practitioners routinely screen male patients for prostate cancer. Screening is done by testing the patient's blood for PSA.

-2-

The PSA screens Dr. Riney ordered for Crouch in 2011, 2012, and 2013 fell within normal limits. However, in 2014, Crouch's PSA level rose to 4.1. Dr. Riney referred Crouch to a urologist who saw Crouch from July 17, 2014, to August 10, 2015, before referring Crouch back to Dr. Riney for ongoing testing and monitoring. At that time, Crouch's PSA was stable at 4.6.

Crouch's PSA level rose to 5.8 on May 3, 2016, a change of 1.2 over a nine-month period. Dr. Riney took no action based on this result: he did not refer Crouch back to the urologist, forward the test results to Crouch's urologist, or consult with the urologist himself; he did not conduct a digital rectal exam which would have allowed him to detect abnormalities in the size, shape, texture, or tenderness of the prostate gland; and he did not order a biopsy or any further testing for prostate cancer. Dr. Riney claimed he discussed the significance of the elevated PSA with Crouch; however, the medical records from Dr. Riney's office do not document any such discussion.

In February of 2017, Crouch's PSA level rose to 6.0. Again, Dr. Riney took no action, and the medical records do not reference any discussion of PSA levels or prostate cancer between Dr. Riney and Crouch. Dr. Riney testified he once more informed Crouch of the elevated test and that Crouch instructed him to take no further action. Dr. Riney claimed Crouch's decision was due to his already poor health and explained that Crouch had a heart attack in 2007, followed

by multiple heart surgeries, including the placement of a pacemaker and defibrillator in 2015. However, in contrast to Dr. Riney's testimony, as of February 20, 2019, Crouch's cardiologist reported Crouch was doing well.

Dr. Riney did not include a PSA test with the order for bloodwork before Crouch's appointment on December 21, 2017. A lab request from Dr. Riney dated December 21, 2017, was provided to Crouch's widow (Peggy) after his death. This request included a PSA test among other blood work. However, unlike other lab requests, there was no evidence this request was forwarded to the lab, nor did Dr. Riney's office notes from the December 21, 2017 appointment indicate additional blood work had been requested. After 2017, there is no record of Dr. Riney ordering PSA testing for Crouch; conducting any other type of screening for prostate cancer such as a digital rectal exam; consulting with or encouraging Crouch to see a urologist; or discussing the potential for prostate cancer with Crouch.

On March 31, 2019, Crouch was taken to the hospital following a fall. During Crouch's hospitalization, "[i]t was determined that the femur fracture was the result of metastatic prostate cancer. . . ."[1] Dr. Riney conceded this point when he signed Crouch's Hospice Certification for Terminal Illness, which stated that Crouch "has been found to have metastatic prostate cancer after falling at home

---

[1] Clinical Note, May 10, 2019 (Record (R.) at Plaintiffs' Trial Exhibit 6).

-4-

and suffering a hip fracture, which apparently was pathologic."[2]  While at the hospital, Crouch indicated his surprise at the stage IV diagnosis because he believed Dr. Riney had been screening him for prostate cancer.

Crouch sought treatment to fight the cancer and extend his life. Nevertheless, his battle was short, ending on June 20, 2019.  No autopsy was performed.  The coroner's report, which stated Dr. Riney would be preparing the death certificate, listed the cause of death as "[m]alignant neoplasm of prostate" and "[s]econdary malignant neoplasm of bone."[3]  The death certificate prepared by Dr. Riney claimed the cause of death was "ischemic cardiomyopathy" and the hip fracture and prostate cancer were "significant conditions contributing to death but not resulting in the underlying cause."[4]

In March of 2020, Peggy Crouch, individually and as executrix of the estate of James Crouch (collectively referred to as Appellees) filed suit against Appellants.  Preceding trial before the McCracken Circuit Court and pursuant to KRE[5] 1006, Appellees provided Appellants with Crouch's medical bills and a summary of those bills prepared by Crouch's attorneys which Appellees intended

---

[2] Hospice Certification of Terminal Illness (R. at Plaintiffs' Trial Exhibit 7).

[3] Lourdes Hospice Coroner Report (R. at Plaintiffs' Trial Exhibit 8).

[4] Kentucky Certificate of Death (R. at Plaintiffs' Trial Exhibit 16).

[5] Kentucky Rules of Evidence.

to use at trial. That summary listed the total medical expenses from Crouch's admission to the hospital for his fall and hip fracture and any subsequent related hospitalization and treatment as $443,501.30.[6] Appellants made no pretrial objection to the summary, rather the parties jointly stipulated to the authenticity of the medical bills contained therein.

At trial, Peggy confirmed the medical expenses incurred for Crouch's treatment. Dr. Eric Gwynn (Dr. Gwynn), an expert witness for Appellees, testified that the medical bills and expenses included in the summary were reasonable, necessary, and related to Crouch's pathologic bone fracture and treatment of his prostate cancer. Dr. Gwynn testified on direct examination that he reviewed the underlying medical bills and they matched the summary provided. There was no objection to his testimony, nor did Appellants object to admission of the medical expense summary into evidence. Appellants did not challenge the reasonableness, necessity, or relatedness of any specific medical expenses through cross-examination or through their own witnesses.

Appellees presented the jury with two expert witnesses. Both experts were timely identified in 2022 and were deposed by Appellants. In addition to Dr. Gwynn, there was Dr. Alan David (Dr. David). Dr. Gwynn described himself as a urological oncologist with twenty years' experience. Though he was not a board-

---

[6] James Crouch's Medical Expense Summary (R. at Plaintiff's Trial Exhibit 18).

certified oncologist, he testified that urologists are the primary care providers for patients undergoing the treatment and monitoring of prostate cancer. At least fifty percent of his practice involved treating patients with prostate cancer. Though he did not review Crouch's entire medical history, he testified to the significant records he had reviewed. He advised the jury that prostate cancer is treatable and even curable if it is detected early, but by the date of Crouch's fall, his cancer had advanced such that it was incurable, stage IV, and had metastasized throughout Crouch's body.

Dr. Gwynn was familiar with PSA testing, and he opined that if Dr. Riney had followed up on Crouch's elevated PSA in 2016 by discussing the results with Crouch, performing a digital rectal exam, ordering a biopsy, or referring Crouch to a urologist that Crouch could have received a diagnosis and begun treatment while the cancer was still curable. By failing to take any action when his patient's PSA level rose from 4.6 to 5.8, Dr. Gwynn testified that Dr. Riney breached the standard of care he owed to Crouch. In addition, Dr. Gwynn testified that by failing to detect Crouch's prostate cancer early, the cancer metastasized which caused Crouch's hip fracture, his subsequent hospitalizations, medical expenses, and death. Dr. Gwynn explained that the metastasizing prostate cancer affected Crouch's overall health and multiple organ systems in Crouch's body,

"kidneys, liver, heart – you name it."[7] Appellants made no challenge to Dr. Gwynn's qualifications as an expert before or during trial or during his testimony.

Appellees' second expert, Dr. David, was a family medicine practitioner with over forty years' experience in the field and additional experience teaching and supervising aspiring family medical practitioners through various military and medical school programs. Though Dr. David had retired briefly from active practice following a cross-country move, he was practicing family medicine at the time of trial, at the time of Crouch's hospitalization and death, and at the time Crouch was a patient of Dr. Riney. In addition, Dr. David had participated in approximately forty autopsies throughout his career.

Dr. David discussed the medical records he reviewed, though he admitted to not reviewing every single item in Crouch's history, including old records related to Crouch's heart surgeries and treatment by a pulmonologist in the early 2000's. Dr. David described family practice medicine and how Dr. Riney breached the standard of care by failing to take any follow-up action and failing to document a plan for care when Crouch's PSA level rose to 5.8 and again to 6.0. Dr. David explained that any discussion between Dr. Riney and Crouch about the PSA test results and the possibility of prostate cancer should have been documented in Crouch's records, especially if it was Crouch's decision to ignore

_____

[7] VR: Testimony of Dr. Eric Gwynn, February 6, 2024, at 51:20-51:57.

medical advice and forego further testing or treatment. Dr. David believed Dr. Riney's inaction was the cause of Crouch's subsequent injuries and death due to prostate cancer metastasizing throughout his body, affecting multiple bones and organs and Crouch's ability to recover from the trauma of the fall and fracture. Dr. David testified that the cancer was "eating [Crouch] alive."[8] When asked by Appellants' counsel whether Crouch's death was ultimately caused by his cardiac and pulmonary issues instead of cancer, Dr. David responded: "All those conditions you brought up contributed to it, but without metastatic raging prostate cancer, despite his pulmonary and cardiovascular issues, I think [Crouch] had a life expectancy at least of several more years."[9] Dr. David again opined: "What did him in was the metastatic prostate cancer that probably made everything worse in the process, but it was the issue that tipped him over into dying at that point in time."[10] Furthermore, Dr. David pointed out that Dr. Riney listed Crouch's prostate cancer as the reason for his admission to Hospice, the coroner cited prostate cancer as Crouch's cause of death, and even the death certificate prepared by Dr. Riney listed both prostate and bone cancer as contributing to Crouch's

---

[8] VR: Testimony of Dr. Alan David, February 5, 2024, at 11:06-11:07.

[9] VR: Testimony of Dr. Alan David, February 5, 2024, at 44:13-44:33.

[10] VR: Testimony of Dr. Alan David, February 5, 2024, at 44:36-44:53.

death.  Appellants did not challenge Dr. David's qualifications as an expert before or during trial.

At the close of all evidence, Appellants moved generally for a directed verdict.[11]  Their motion was denied.  Appellants then asked the trial court "to strike [Appellees'] claims for medical expenses."[12]  Appellants argued Appellees failed to present sufficient proof that Crouch's medical bills were related to Dr. Riney's negligence because Dr. Gwynn had not reviewed the individual bills contained in the medical expense summary.  Appellees responded by disputing Appellants' interpretation of Dr. Gwynn's testimony.  The trial court agreed with Appellees' arguments and denied Appellants' motion to strike.

The case was submitted to the jury who returned a unanimous verdict in favor of Appellees, awarding a total of $1,423,501.30.  The verdict included an

---

[11] The entirety of the motion is as follows:  "At the conclusion of the evidence, of all the evidence, the Defendant does need to make a motion for directed verdict.  We don't feel Plaintiffs satisfied its burden of proving by a preponderance of the evidence.  And, as a subset of that – (Here the trial court interrupts Appellants because jurors have entered the courtroom.  There is a brief exchange between Appellants' and Appellees' counsel, then Appellants resume their argument once the white noise has been activated.)  I will move for a directed verdict.  I believe I am entitled to it, but I will understand if the Court believes there are differing – looking at the evidence in the light most favorable to the Plaintiff."  VR:  Trial, February 8, 2024, at 1:25:57-1:26:48.

Repeatedly in Appellants' briefs, Appellants claim the trial court cut them off or refused to hear their argument for directed verdict.  The record does not support this.  Following Appellants' motion for directed verdict, the trial court did prevent *Appellees* from responding and ruled to deny Appellants' directed verdict motion without hearing *Appellees'* argument, but the trial court in no way prevented Appellants from making a more detailed argument.

[12] VR:  Trial, February 8, 2024, at 1:27:06-1:27:08.

-10-

award of $443,501.30 for Crouch's medical expenses; $630,000.00 for Crouch's pain and suffering; and $350,000.00 for Peggy's loss of consortium. Judgment was entered consistent with the verdict on February 19, 2024.

Appellants filed a timely motion for new trial or, in the alternative, to alter, amend, or vacate the judgment. Specifically, Appellants moved the trial court "to grant a new trial pursuant to CR[13] 59.01(d) and (e), due to [Appellees'] failure to prove that Mr. Crouch's prostate cancer proximately caused the medical expenses listed in the medical summary entered in evidence . . . , or, in the alternative, amend, or vacate the judgment by striking $443,501.30 in medical expenses from damages pursuant to CR 59.05."[14] Appellants also claimed a new trial was warranted under CR 59.01(f) because of the "failure to provide sufficient proof that Dr. Riney violated duties that resulted in harm"[15] to Appellees. The trial court denied the motion and this appeal followed.

## II. STANDARD OF REVIEW

### A. Motion for a New Trial

To begin, we note that an order granting or denying a new trial under CR 59.01 or CR 59.05 is not considered a final order and, therefore, is not

---

[13] Kentucky Rules of Civil Procedure.

[14] R. at 307.

[15] R. at 313.

appealable.  *Embry v. Turner*, 185 S.W.3d 209, 213 (Ky. App. 2006); *Ford v. Ford*, 578 S.W.3d 356, 366 (Ky. App. 2019).  However, such an order may be reviewed as an appeal from the final judgment.  *Embry*, 185 S.W.3d at 213; *Ford*, 578 S.W.3d at 366.  The decision of the trial court to overrule a motion for new trial will be disturbed on appeal only if there exists manifest error or abuse of discretion.  *Embry*, 185 S.W.3d at 213.  "In undertaking our analysis of the trial judge's eventual decision not to allow a new trial here, we must be mindful that the decision is presumptively correct, and that we cannot reverse unless it was clearly erroneous."  *Id*. (citations omitted).

Under Kentucky law, to prevail on a claim of medical negligence, the plaintiff generally must present expert testimony to establish the essential elements of the claim:  the standard of care, breach of the standard of care, causation, and injury.  *See Baylis v. Lourdes Hospital, Inc.*, 805 S.W.2d 122 (Ky. 1991); *Brown v. Griffin* 505 S.W. 3d 777 (Ky. App. 2016).  The jury in the case *sub judice* was presented with the following instruction:

> In his treatment of James Crouch, it was the duty of Defendant Dr. Jeffrey Riney, as an agent of Jeffrey L. Riney, M.D., & Associates, PLLC, to exercise the degree of care and skill expected of a reasonably prudent physician, specializing in family medicine, acting under the same or similar circumstances as those in this case.
>
> Are you satisfied from the evidence that these Defendants failed to comply with this duty, and that such

> failure was a substantial factor in causing injury and/or
> death to James Crouch?[16]

The jury unanimously believed Appellees had proven duty, breach, causation, and injury, answering the above query in the affirmative. Appellants did not submit an alternative instruction and have raised no issue with the instruction on appeal. Therefore, the parties agree the trial court correctly advised the jury on the law and the elements Appellees were required to prove. Believing Appellees failed to present sufficient proof, Appellants moved for a directed verdict at the close of the case.

### B. Directed Verdict

"In general, a motion for directed verdict admits the truth of all evidence which is favorable to the party against whom the motion is made." *Simpson County Steeplechase Ass'n, Inc. v. Roberts*, 898 S.W.2d 523, 527 (Ky. App. 1995). Therefore, when presented with a proper motion for directed verdict, "the trial judge must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion." *Bierman v. Klapheke*, 967 S.W. 2d 16, 18 (Ky. 1998). The trial court should grant a directed verdict only if "there is a complete absence of proof on a material issue or if no disputed . . . facts exist upon which reasonable minds could differ." *Id*. at 18-19. Furthermore, "[a] directed

---

[16] Judgment dated February 19, 2024 (R. at 302).

-13-

verdict is appropriate when, drawing all inferences in favor of the nonmoving party, a reasonable jury could only conclude that the moving party was entitled to a verdict." *Buchholtz v. Dugan*, 977 S.W. 2d 24, 26 (Ky. App. 1998) (citation omitted).

Upon appellate review, this Court "must ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party." *Bierman*, 967 S.W. 2d at 18. (citing *Myers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814 (Ky. 1992)). Giving deference to the trial court who heard and considered the evidence, a reviewing court cannot substitute its judgment for that of the trial judge unless the trial judge was completely erroneous. *Davis v. Graviss*, 672 S.W.2d 928 (Ky. 1984), *overruled on other grounds by Savage v. Three Rivers Medical Center*, 390 S.W. 3d 104 (Ky. 2012). The decision of the trial court will stand unless it is determined that "the verdict *rendered* is 'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.'" *Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459, 461-462 (Ky. 1990) (quoting *NCAA v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988)).

Therefore, based upon the long history of Kentucky law, a motion for directed verdict questions the weight of the evidence not the admissibility. And where there is conflicting evidence or testimony, "[u]nder our system it is within

-14-

the exclusive province of the jury to pass upon the credibility of the person testifying and to determine the weight to be given that person's testimony." *Arnett v. Arnett*, 293 S.W.2d 733, 735 (Ky. 1956). Similarly, "[w]here expert testimony is conflicting, the issue becomes a question to be determined by the finder of fact," in this case the jury. *Howard v. Kingmont Oil Co.*, 729 S.W.2d 183, 186 (Ky. App. 1987) (citing *Kentucky Power Co. v. Kilbourn*, 307 S.W.2d 9, 12 (Ky. 1957)). Particularly as to expert witnesses, "[a]ny lack of specialized training goes only to the weight, not to the competency, of the evidence." *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992) (citing *Arndale v. Parndell Peay,* 411 S.W.2d 473 (Ky. 1967)).

In this case, the trial court applied the appropriate standard, stating on the record, "the court finds in viewing the evidence in the light most favorable to the [Appellees], reasonable jurors could be satisfied from the evidence that Dr. Riney's negligence caused death and/or injury to Mr. Crouch."[17] On review, ascribing to the evidence all reasonable inferences and deductions in favor of Appellees as directed by established law, we do not find the verdict of the jury to be palpably or flagrantly against the weight of the evidence presented at trial.

However, Appellants seek a different standard of review. Appellants agree Appellees presented evidence on duty, breach, causation, and injury.

---

[17] VR: Trial, February 8, 2024, 1:26:53-1:27:06.

Nevertheless, Appellants insist Appellees' evidence was substantively improper and unable to support the jury's verdict *as a matter of law*. By Appellants' entangled reasoning, if neither Dr. David nor Dr. Gwynn were qualified to render opinions on causation, damages, or the standard of care then Appellees failed to prove their case and a directed verdict should have been granted.

Therefore, Appellants argue the trial court erred by denying their motion for directed verdict and allowing the case to be decided by the jury. In particular, Appellants claim: (1) Neither Dr. David nor Dr. Gwynn were qualified to testify as to the standard of care of a family medicine practitioner; (2) Neither Dr. David nor Dr. Gwynn were qualified to testify as to the cause of Crouch's death; (3) Dr. David and Dr. Gwynn lacked the proper foundation to opine on the cause of Crouch's death; (4) Dr. Gwynn failed to establish Crouch's medical expenses were proximately related to his cancer and hip fracture; and (5) Appellees' summary of Crouch's medical expenses should not have been admitted into evidence.

"The decision to qualify a witness as an expert rests in the sound discretion of the trial court." *Kemper v. Gordon*, 272 S.W.3d 146, 154 (Ky. 2008) (citation omitted). Likewise, "[w]e review a trial court's evidentiary rulings for an abuse of discretion." *Estate of Moloney v. Becker*, 398 S.W.3d 459, 463 (Ky. App. 2013) (citing *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577

(Ky. 2000)). *When the alleged error is preserved*, "[t]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Pauly v. Chang*, 498 S.W.3d 394, 411 (Ky. App. 2015) (citations omitted). However, Appellants' claims are unpreserved.

### C. Unpreserved Error:  Forfeiture v. Waiver

Kentucky has long upheld the principle:  "[u]nless there may be attributed to every trial judge an omniscience which few possess, it is necessary to impose on the attorney the responsibility of assisting the judge. . . .  He should not be permitted on appeal to claim an abortive trial to which he has materially contributed by failure. . . to assist the trial judge past the pitfall of error." *Little v. Whitehouse*, 384 S.W.2d 503, 504-05 (Ky. 1964).  This has been incorporated into KRE 103(a)(1):

> Error may not be predicated upon a ruling which admits
> or excludes evidence unless a substantial right of the
> party is affected; and. . . .  If the ruling is one admitting
> evidence, a timely objection or motion to strike appears
> of record, stating the specific ground of objection, if the
> specific ground was not apparent from the context. . . .

And at CR 46:

> Formal exceptions to rulings or orders of the court are
> unnecessary; but for all purposes for which an exception
> has heretofore been necessary it is sufficient that a party,
> at the time the ruling or order of the court is made or
> sought, makes known to the court the action which he

desires the court to take or his objection to the action of the court, and on request of the court, his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.

Though given ample notice through pretrial discovery, Appellants failed to raise any pretrial objections to the qualifications of Appellees' experts. When an alleged error revolves around the qualifications of an expert witness or the methodology utilized by the expert in forming his or her opinion, appellate courts typically expect the contesting party to have raised the issue at the trial court level by requesting a pretrial *Daubert* hearing or a motion in limine to challenge the reliability of the proffered testimony. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592-95 (1993). Appellants failed to do so, thereby failing to preserve the alleged error. *See Tharp v. Commonwealth*, 40 S.W.3d 356, 367-68 (Ky. 2000).

Appellants contend they were not required to make a *Daubert* challenge because they agreed Drs. David and Gwynn were qualified to testify "within their respective areas of established expertise." Appellants' Reply Brief at 5. However, Appellants urge us to find the trial court erred for failing to discern *sua sponte* that "[b]oth doctors lacked the education, professional qualifications, and foundation required" to give their opinions on the cause of Crouch's death and the standard of care. Appellants' Reply Brief at 6. Challenging an expert's

-18-

qualifications to render an opinion is precisely the purpose of a *Daubert* hearing, and we find no merit in Appellants' arguments to the contrary.

Nor did Appellants make objections during trial to any of the myriad errors they allege. When an appellant urges the verdict of the jury was based on incompetent evidence, the appellant must have preserved that question for review in this Court by making a contemporaneous objection. *See Commonwealth Dep't of Highways v. Vincent*, 357 S.W.2d 678, 679 (Ky. 1962). But when testimony goes into the record without objection, "[i]t is now too late for appellant to complain." *Sallee v. Ashlock*, 438 S.W.2d 538, 541 (Ky. 1969). "In order for appellant to save the question of the competency of this evidence, objection must have been made at the time of its introduction." *Id*. (citations omitted).

A vague, blanket motion for directed verdict is not a substitute for a timely and specific objection and does not preserve the alleged errors Appellants raised for the first time in their motion for a new trial. "Lawsuits must not stand or fall on trick objections." *See T.C. Young Construction Co., Inc. v. Brown*, 372 S.W.2d 670, 674 (Ky. 1963). When an appellant raises a claim of error for the first time in a motion for directed verdict, the alleged error has not been preserved for appellate review. *Kentucky Trust Co. v. Commonwealth, Dep't of Highways*, 413 S.W.2d 350, 351 (Ky. 1967).

Because Appellants failed to raise a challenge to Dr. David's and Dr. Gwynn's qualifications before the trial court, we find Appellants forfeited the issue. Our Kentucky Supreme Court provides the following guidance:

> [W]hen a party fails to raise an issue or otherwise preserve an allegation of error for review, the issue is forfeited. *United States v. Olano*, [507 U.S. 725, 731 (1993)] ("No procedural principle is more familiar to this Court than that a constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (cleaned up). Again, while many courts, including this Court, have justified the refusal to consider unpreserved errors under a waiver theory, the proper basis is forfeiture. *Kontrick* [*v. Ryan*, 540 U.S. 443, 458 n.13 (2004).]

*Gasaway v. Commonwealth*, 671 S.W.3d 298, 314 (Ky. 2023).

On the other hand, when Appellees moved to introduce Crouch's medical expense summary, Appellants did not merely fail to object, they consented to its introduction. This is not forfeiture of the objection, but waiver of the alleged error. "Although jurists often use the words interchangeably, forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* (citations omitted).

The distinction between forfeiture and waiver affects the standard of review. "The valid waiver of a known right precludes appellate review while a forfeited claim of error may be reviewed for palpable error." *Id.* at 314 (citation

omitted). However, "[a]bsent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review . . . unless such a request is made and briefed by the appellant." *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008). Here, Appellants have made no request for palpable error review.

Therefore, Appellants having consented to the introduction of the Medical Expense Summary into evidence, we find they have waived appellate review of that issue. Appellants have also waived their only avenue for appellate review of the competency of Dr. David and Dr. Gwynn by failing to request palpable error review (though it would have been a futile effort).[18] Thus, the only issue remaining is Appellants' claim that Dr. Gwynn's testimony was unable to support an award of medical damages.

### D. Motion to Strike

Appellants claim they are entitled to review of their motion to strike under the abuse of discretion standard. Appellants' Brief at 19. However, this was not a contemporaneous objection made during trial to strike any tangible or

---

[18] In *Tharp*, 40 S.W.3d at 368, the Kentucky Supreme Court addressed a similar situation where a *Daubert* hearing was not requested, holding that "[w]e decline to speculate on the outcome of an unrequested *Daubert* hearing, or to hold that the failure to conduct such a hearing *sua sponte* constitutes palpable error." This was reaffirmed in *Davis v. Commonwealth*, 147 S.W.3d 709, 728 (Ky. 2004). In *Davis*, the appellant likewise failed to request a *Daubert* hearing but challenged the qualifications of appellee's expert on appeal. *Id*. The Kentucky Supreme Court again declared the failure of the trial court to conduct a *Daubert* review *sua sponte* was not palpable error. *Id*.

testimonial evidence. Appellants' "motion to strike" was made at the close of evidence, following discussion of jury instructions, and after the trial court overruled Appellants' general motion for directed verdict. Appellants moved the trial court to disallow Appellees' claim for medical expenses because of a lack of evidence. No matter the label Appellants attached, this was a second (and more specific) attempt for a directed verdict and will be treated as such on review.

## III. ANALYSIS

Appellants claim the trial court should have disallowed Appellees' claim for Crouch's medical expenses because there was no evidence that those expenses were proximately related to his prostate cancer and not his poor underlying cardiac and pulmonary conditions. Appellants' argument is rooted in what they believe to be defects regarding the credibility and weight of Dr. Gwynn's testimony.

Dr. Gwynn testified on direct examination that he reviewed the underlying medical bills; the bills corresponded to the amounts contained in the medical expense summary; and the expenses were reasonable, necessary, and related to Crouch's prostate cancer and pathologic hip fracture. However, Appellants insist Appellees were required to do more to prove the bills did not contain expenses Crouch would have incurred even without the cancer. Appellants point to Crouch's history of other health issues, however there was no evidence

presented at trial that Crouch suffered from a co-occurring, unrelated illness or injury.[19] In addition, both Dr. Gwynn and Dr. David opined that Crouch's stage IV prostate cancer had metastasized and was affecting all his body systems and functions thereby making any treatment he received following his fall related to his cancer. Furthermore, Appellees had the opportunity to cross-examine Dr. Gwynn and challenge his testimony on direct.

Appellants argue that Dr. Gwynn's testimony was negated on cross-examination. Appellants point to this single exchange in Dr. Gwynn's lengthy testimony:

> Question: All right. In fact, the very first [item in the summary] is $409,000. Did you look at each of those hospitalizations, and the billings to determine what might have been cardiac care? What might have been the pulmonology care? And what might have been care for other purposes?

[19] Appellants ask this Court to note the unreported case of *Hall v. Highlands Hospital Corporation*, No. 2022-CA-0771-MR, 2024 WL 1221445 (Ky. App. Mar. 22, 2024), where another panel of this Court found a trial court committed error by allowing a medical expense summary into evidence where the expert witness could not explain the justification for each expense. *Id*. at *7. However, the facts of *Hall* are readily distinguishable from the case *sub judice*. In *Hall*, decedent was at the hospital being treated for respiratory distress when his wheelchair was tipped over causing a head injury. *Id*. at *1. The case went to trial solely on the issue of the wheelchair tipping. *Id*. at *2. At trial, the expert witness for decedent's estate admitted he did not review the underlying bills to distinguish what costs should be attributed to the wheelchair incident versus the respiratory distress. *Id*. at *7. Though Crouch had a history of other medical issues, there is nothing in the record to indicate that from the date of his fall until the date of his death he was receiving treatment for anything unrelated to his metastasizing cancer and bone fractures.

Answer:  No, I used it as a kind of summary, and in fact I thought that number was low.  I was surprised as extensive as his hospitalizations are that it was there.[20]

Appellants allege that, by this single exchange, Dr. Gwynn contradicted his direct testimony and admitted he did not review Crouch's actual medical bills.  We find this to be a stretch, but a stretch the jury could have made if it had chosen to do so.  It did not.

Appellants urge this Court not only to adopt their interpretation of Dr. Gwynn's statement, but to embrace the principle of negation.  By finding Dr. Gwynn contradicted himself, Appellants argue Dr. Gwynn's testimony could not have supported an award of medical damages, and a directed verdict should have been granted on the issue of medical expenses.  However, negation is not the law of the Commonwealth.  "[W]hen a directed verdict motion is made, the court may not consider the credibility or weight of the proffered evidence because this function is reserved for the trier of fact."  *Daniels v. CDB Bell, LLC*., 300 S.W.3d 204, 215 (Ky. App. 2009) (citation omitted).  Kentucky law is well established that "the jury resolves any conflicts in the testimony. . . ."  *Estate of Moloney*, 398 S.W.3d at 462 (citations omitted).

The jury heard the testimony of Dr. Gwynn in its entirety along with evidence presented by both Appellants and Appellees.  Appellants were able to

---

[20] Trial, Testimony of Dr. Gwynn. VR: February 6, 2024, 29:12-29:35.

thoroughly cross-examine Dr. Gwynn regarding any inconsistencies between his direct and his cross-examination. Appellants also possessed the original medical bills and could have questioned Dr. Gwynn regarding any charge they believed was unrelated to Crouch's cancer and the treatment for his fall. Construing the evidence in favor of Appellees, we find no error. The trial court properly submitted the question of medical damages to the jury. It was for the jury to consider Dr. Gwynn's credibility and the weight to give his testimony.

We find the record provides sound reason in support of the jury's estimation of damages and are unable to conclude the verdict was the result of manifest injustice, passion, or prejudice. *See Vincent*, 357 S.W.2d at 680.

## IV. CONCLUSION

Appellants complain the trial court did not give them ample time to present the merits of their motion for directed verdict. We find no evidence in the record to support this accusation,[21] and we again caution litigants that a motion for directed verdict does not negate the failure to make proper and timely objections.

> In summation, we echo the wisdom of Justice Palmore on the necessity of respecting the rules of procedure:
>
> . . . "[W]e detect what appears to be a failure to appreciate the importance of and necessity for procedural regularity in the conduct of trials. . . . [P]rocedural requirements generally do not exist for the mere sake of form and style. They are lights and buoys to mark the

---

[21] *See* n.12 herein.

channels of safe passage and assure an expeditious voyage to the right destination. Their importance simply cannot be disdained or denigrated. Without them every trial would end in a shipwreck."

Like other procedural rules, the preservation requirement serves the orderly administration of justice. It cannot be said to elevate form over substance or otherwise unfairly cut off the rights of litigants. Palpable error review . . . exist[s] to prevent manifest injustice in the event a party fails to preserve an alleged error. We implore appellate litigants to scrupulously adhere to the rules of procedure for the sake of their own cause and to ensure the orderly disposition of court proceedings.

*Gasaway*, 671 S.W.3d at 314 (quoting *Brown v. Commonwealth*, 551 S.W.2d 557, 559 (Ky. 1977)).

Therefore, for the foregoing reasons we find no error with the trial court's denial of Appellants' motion seeking a new trial or, in the alternative, to alter, amend, or vacate the judgment, and we affirm the judgment entered by the McCracken Circuit Court following the unanimous verdict of the jury.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Bradley D. McPeek
Cincinnati, Ohio

E. Frederick Straub, Jr.
Matthew S. Eddy
Paducah, Kentucky

BRIEF FOR APPELLEES:

Brian S. Brownfield
Sarah Jane Dufour
Kelly J. Brownfield
Louisville, Kentucky

Tyler S. Thompson
Chad O. Propst
Louisville, Kentucky